Richards W. Hannah, J.
These cases present two problems: first, what constitutes proper questioning of juveniles by the police, and the question of whether Miranda v. Arizona (384 U. S. 436) is applicable to children who are respondents in this court. It is of the utmost importance to Juvenile Court Judges to know the present attitude of appellate courts on these problems. Accordingly, it is the court’s hope that an appeal will be taken so that these issues can be decided with finality for future guidance.
The respondents, Clarence Billings, age 9, Andrew Rust, age 10, and Robin Alexander, age 12, are alleged to have unlawfully entered Public School No. 191 in Brooklyn, New York, on October 15,1966 by way of a window and damaged equipment and furniture and stolen various supplies. The petition alleged that the acts, if done by an adult, would constitute the crime of malicious mischief.
The respondent, Ronnie Thomas, age 13, is alleged to have committed the same acts on October 22,1966 at the same school.
These respondents were apprehended as a result of an investigation by Detective Meyer, who received their names from a third person during the course of his investigation. No eyewit *53 nesses testified that they saw the respondents commit the alleged acts. Detective Meyer testified that he was notified of the occurrence on November 7, 1966 and started his investigation which led him to Bust, who was questioned in the presence of his mother and who told him in answer to the question “ Had he done it? ”, that he Bust and Billings and Alexander had entered the premises on October 15,1966 about 8:30 p.m. after Alexander had pushed in a window and opened the door for them to enter and that they had damaged and taken property. He said that the same boys had done the same thing on October 29, 1966. Meyer questioned Billings at Public School No. 191 (no parents present) who admitted entering the premises on both dates and damaging the property. He questioned Alexander (no parents present) at Public School No. 191 during course of investigation who denied being involved at all on both dates. He questioned Thomas (no parents present) at Public School No. 178 in the presence of a teacher, who admitted being there but claimed that older boys had broken the window with a stone on October 22, 1966 about 1:00 p.m. and one of the boys opened the door of the Assistant Principal’s office, so he entered and picked up a pencil off the floor and left. The detective testified that he was trying to ascertain whether they were responsible for all or just part of the damage, and that they were taken into custody after questioning at the school and that he went to their homes and informed the parents that he had taken them into custody.
The Law Q-uardian moved to suppress Meyer’s testimony upon the ground that he had not advised the respondents of their rights, which Meyer admitted. Without any witnesses there can be no finding in any of the cases unless these admissions are admissible. In all the petitions the respondents rested at the close of the petitioner’s case after moving to suppress and for a dismissal. The court reserved decision upon all motions.
children’s court philosophy
In Kent v. United States (383 U. S. 541 [March, 1966]), the Supreme Court stated that the theory of the children’s court is that it is rooted in social welfare rather than in corpus juris, that its proceedings have always been designated as civil rather than criminal, that it has been conducted on a parens patriae basis, that the purpose of the court was to supply guidance and rehabilitation to the juvenile and protection to society and not to fix criminal responsibility, guilt and punishment. Since, the court continued, the case is supposed to proceed on this philosophy, the juvenile cannot complain that he is not receiving the impor *54 taut rights available in criminal cases. (The court then lists some of them.) The juvenile is entitled to claim only the fundamental due process rights to fair treatment. The privilege of silence is one of these rights. (Malloy v. Hogan, 378 U. S. 1 [1964]). The Supreme Court did not rule in Kent that the constitutional guarantees which would be applicable to adults charged with serious offenses must be applied in the juvenile court proceedings to children charged with allegations of law violations. Therefore, the question is undecided except for fundamental due process rights; silence being one of these rights. At the present time the Supreme Court is considering Matter of Gault v. Arizona (99 Ariz. 181 [1965], probable jurisdiction noted 384 U. S. 997 [1966]) in which one of the issues is the procedure and philosophy of the Family Court.
On September 1,1962, a new Family Court Act went into effect in New York to replace the Children’s Court Act. The Legislative Report on the Family Court Act (McKinney’s Sess. Laws, 1962, p. 3430) stated the legislative intent. “ The Committee concluded that it would be unwise, at this time, to give the Family Court the extensive powers given the criminal courts under the Penal Law of the State of New York. This would introduce the technical requirements of the Code of Criminal Procedure. In the Committee’s view, while a due process of law should be used in the Family Court, criminal powers and procedures would be inconsistent with the proper development of the Family Court during its formulative period, as a special agency for the care and protection of the young and the preservation of the family ”. The report continued (pp. 3436-3437): 11 The New York Court of Appeals has indicated in People v. Lewis, 260 N. Y. 171, 183 N. E. 353,86 A. L. R. 1001 (1932), that not all of the constitutional requirements of a ‘ criminal trial ’ necessarily apply to a ‘ civil proceeding ’ involving juvenile delinquency. The practical result is that the Legislature has wide discretion in prescribing the processes of law in this area ”. The Legislature also provided that the Code of Criminal Procedure does not apply to the Family Court (Code Grim. Pro., § 11) and provided that the CPLR be used to supplement the procedure where the provisions of the Family Court Act did not cover the situation (these are the rules of practice in the civil courts) (Family Ct. Act, § 165). This has been ineffective, for the CPLR does not cover the same material as the Code of Criminal Procedure. Since the adoption of the Family Court Act, the practice and procedure in this court has been changed radically to provide “ a due process of law ” for juvenile cases (Family Ct. Act, § 711), which provided provisions respecting detention before and during the proceedings *55 (Family Ct. Act, art. 7, part 2),- notice of allegations (Family Ct. Act, §§ 736, 737); notification to the child of his privilege to remain silent (Family Ct. Act, § 741); that only competent, relevant and material evidence may be admitted upon a fact-finding hearing (Family Ct. Act, § 744); a statement by the Judge of the grounds for a finding of delinquency (Family Ct. Act, § 752), and a hearing as to the final disposition (Family Ct. Act, §§ 743, 746). Most important, the juvenile can be represented upon request or on the court’s own motion by a Law G-unrdian (attorneys as the legal aid staff who represent respondents) if unable to afford an attorney, (Family Ct. Act, art. 2, part 4). Law Guardians represent respondents in 85% of all delinquency cases, in all supervision cases where the petitioner is one of the parents, and the children in all neglect cases in New York City.
What is the function of an attorney in this court, considering the theory of the court? Is he to represent the juvenile as an attorney would in a criminal case or is he to assist the court in producing the facts on a fact-finding hearing or to conceal the facts by raising technical objections? Is he to resort to technicalities to dismiss the petition, knowing that the juvenile committed the act? On the dispositional hearing, is he to insist that each juvenile be returned to the community, knowing that he had been involved in prior acts of juvenile delinquency or that the family cannot control him or that he obviously is a menace to others? (See Isaacs, “The Role of the Lawyer in Representing Minors in the New Family Court ” — 12 Buffalo L. Rev. 501, 506 [1963]). Presently, most attorneys must be considered as seeking a favorable result — complete freedom for his client. If this attitude continues, the theory of this court will be destroyed and it will become another criminal court for children. In my opinion, the presence of attorneys is desirable but their role should be more clearly defined. The presence of attorneys has resulted in making many contested hearings into truly adversary proceedings. On the plus side, the respondent’s case is being better prepared and presented. However, the present situation has progressed to the point that the statute should require representation for petitioners and, in cases where the police are involved, the Department of Welfare, the Board of Education, the Transit Authority and various voluntary organizations, they have deemed it necessary to have their own attorneys present to present the petitioner’s interests. Some individual petitioners also appear by attorney. When petitioners are not represented by an attorney, the Judge must conduct the petitioner’s case as best he can since he had no advance knowledge of the facts and *56 has not interviewed or been told what evidence or witnesses are available or needed. This practice is hardly fair, for obvious reasons, and representation should be provided for them. (Matter of “ Lang ”, 44 Misc 2d 900, 905 [1965].) The sole purpose of this review of the practice in the court in the City of New York, is to show that many of the elements of an adversary proceeding are now present and that the court is taking on the appearance of a criminal court. Recently, the Court of Appeals rejected People v. Lewis (260 N. Y. 171) and in Matter of Gregory W. (19 N Y 2d 55, 62) said:
“We believe that the rationale underlying that opinion has been rejected by the Legislature and that the specific holding of the case has been overruled by statute.
“ While the Family Court Act specifically states that the proceedings held thereunder are not criminal in nature, the various provisions made for the protection of the rights of children who are charged with juvenile delinquency are indicative of a legislative recognition of the fact that such proceedings, resulting as they do in a loss of personal freedom, are at the very least quasi-criminal in nature ”. (Italics mine.)
Therefore, this court is now a court of quasi-criminal nature as to juvenile delinquency proceedings, but the issue now is how far this court should go in applying the principles of constitutional and criminal law to juveniles.
In the Matter of Henry B. (27 A D 2d 529) there is some indication that all the essential proof required in a criminal case to prove rape was not necessary to prove juvenile delinquency. This decision would indicate that it is not necessary to prove all the essentials of a crime in delinquency proceedings.
The questioning of juveniles of the ages of these respondents in the absence of a parent, a friend, a relative or an attorney does not seem proper considering their ages, the circumstances and place of the questioning except as to Rust, under Gallegos v. Colorado (370 U. S. 49) and Haley v. Ohio (332 U. S. 596). No statute in New York requires the presence of an adult at the interrogation. Section 724 of the Family Court Act provides in substance when a juvenile person is taken into custody the officer “ shall immediately notify the parent or other person legally responsible for his care, or the person with whom he is domiciled, that he has been taken in custody ”, that after making a reasonable effort to give the required notice that he shall forthwith (and with all reasonable speed) take the child and without his first being taken to the police station house, to the Family Court located in the county in which the alleged act was committed, unless he determines that it is necessary to question the *57 child, when he may take the child to a facility designated by the appropriate Appellate Division (of the Supreme Court) as a suitable place for the questioning of children and there question him for a reasonable period of time. The section further provides that what is a “ reasonable period of time ” depends on the child’s age and the presence or absence of parents or persons legally responsible for his care. In Matter of Williams (49 Misc 2d 154 [1966]) the court held that the police have the positive duty to take affirmative steps to attempt to contact the parents before proceeding to question him. The important fact is not notification but the presence of an adult during the questioning. In Gallegos v. Colorado (370 U. S. 49 [1962]), a 14-year-old boy assaulted a man on December 20, 1958; on January 1, 1959 the juvenile was picked up and immediately admitted the assault and was placed in Juvenile Hall; on January 2, 1959 the police examined him and his mother tried to see him and was refused on the ground it was not visiting hours; from J anuary 1 to 7 he was kept in Juvenile Hall in security but ate with the others; on January 3,1959 a complaint was filed against him; on January 7, 1959 he signed a formal confession; on January 13, 1959 the petition was filed; and on J anuary 16, 1959 a hearing was held in the Children’s Court and he was committed to the Industrial School for an indeterminate period; on January 26,1959 the man died and a murder trial followed in the Criminal Court where he was found guilty. Attention is directed to the fact that this was merely an assault case up to January 26,1959 and while the boy was subsequently convicted of murder, the basis for the reversal was the manner in which he was questioned by the police as well as the manner in which he was detained while under the jurisdiction of the Children’s Court. Therefore, these comments of the Supreme Court would apply to all juveniles accused of crimes. The court said (p. 54): “ He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights — from someone concerned with securing him these rights — and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had”. (See, also, Haley v. Ohio, 332 U. S. 596 [1948]) but where the *58 questioning obviously was a violation of the 15-year-old boy’s constitutional rights.
In the “ New Confession Standards ” by Honorable Nathan R. Sobel, Justice of the Supreme Court, State of New York, the Justice states that the opinions in the several jurisdictions justify a prediction that under Miranda standards, no ‘ ‘ waiver ’ ’ from a juvenile could conceivably be found unless counsel or a parent was in fact present during the interrogation, (p. 11).
The manner in which these respondents were questioned was far different than in Gallegos — but the statements quoted above seem to be equally applicable to the questioning of these respondents in the absence of a parent, friend or attorney.
Other recent cases indicate that courts are greatly concerned with the manner in which juveniles are questioned. In State v. Carlo (48 N. J. 224) the court states that the police should see that a parent or friend is present at the questioning if feasible. In United States v. Glover (372 F. 2d 43 [C. A. 2d]) a finding was set aside because the juvenile was not treated as the United States Code required. In State v. hopes (96 Ariz. 169), a confession was held inadmissible because it was taken by the police before any attempt was made to notify the juvenile parole officer.
The problem of the proper procedure in questioning juveniles, whether in custody or not, is one of the utmost importance in view of the different attitudes of the courts, and it is earnestly recommended that the police and the courts in New York State confer and devise a method which will comply with present day requirements.
Does Miranda apply to juveniles? In my opinion it does, for how can we deprive juveniles of the rights of due process afforded adults?
Miranda v. Arizona (384 U. S. 436, 467) states: “ Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed from being compelled to incriminate themselves ”. This quotation indicates that the Fifth Amendment applies in criminal as well as civil proceedings and to children as well as adults. Miranda requires that if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent; the warning must be accompanied by the explanation that anything said can and will be used against the individual in court; that he must be clearly informed that he has the right to have counsel present at the interrogation, so he can choose between *59 silence and speech; that if the individual wishes the assistance of counsel he must be told that counsel will be appointed for him if he has not the money; that if at any time during the interrogation he wishes to remain silent, or wants counsel, the interrogation must cease until the counsel is present. There is the additional requirement that the warning must be understood and the waiver voluntary. In addition there is a “heavy burden” on the petitioner to show that these elements have been met.
No warnings of any kind were given to these respondents. Even assuming that such warnings were given, it is doubtful that young boys, ages 9,10,12 and 13 would have understood the full import of such warnings and could waive their rights. How can we say that children of these ages can understand these warnings when there is doubt that adults would understand them? How ridiculous it would be to go through the formula of Miranda with children the ages of these respondents.
In Matter of Gregory W. (26 A D 2d 695 [revd. 19 N Y 2d 55]) Judge Hopkins said in his dissent (pp. 696-697): “I recognize that the standards of proof, and the nature of a delinquency proceeding in the Family Court, differ from a criminal prosecution (People v. Lewis, 260 N. Y. 171; Family Ct. Act, §§ 731-749), but I do not consider that the standards of due process are different because of the difference in procedure. Both a criminal prosecution and a juvenile delinquency proceeding may result in detention, if the charge is determined to have been established. I would apply the same constitutional requirements of due process without regard to the nature of the proceeding, the standards of proof, or the punishment to follow, where the liberty of an individual is in the balance (cf. Matter of Alaimo, 16 A D 2d 814). A juvenile charged in the Family Court with the commission of acts amounting to a crime if committed by an adult should surely enjoy the same constitutional safeguards as would the adult charged in a criminal prosecution ”.
Matter of Gregory W. (19 N Y 2d 55) was tried in December, 1964, while Miranda was decided on June 13,1966 and under the holding of People v. McQueen (18 N Y 2d 337) the Miranda doctrine is not retroactive to any findings or convictions prior to June 13,1966. Therefore, the Court of Appeals did not discuss the applicability of Miranda in the Gregory W. case.
The court is not unmindful of the statement in State v. Carlo (supra) that children should not be taught to hide behind constitutional safeguards but I feel that Miranda points the other way. Accordingly, I find that the admissions of these respondents must be suppressed.
*60 People, the police and the press are all concerned regarding the questioning of suspects and when the magic words of Miranda must be spoken to the one being questioned (see article in New York Times, Feb. 26, 1967, p. E12), the answer depends on the opinion of the person answering the question. However the answer is sure that it must be given to one in custody. Were these respondents in custody within the definition of the Supreme Court ? Miranda defines custodial interrogation as (p. 444): “By custodial interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way ”. A footnote adds that this is what the court meant in Escobedo (378 U. S. 478) when it spoke of an investigation which focused on the accused. No one has satisfactorily defined what “ custody ” is for the lay person or the police. When does it start? At what stage of the investigation? Does it start only after the interrogation has reached the accusatory stage ? Must the person test it by attempting to leave or use the telephone or send a telegram or a message? Could boys the ages of these respondents do it? Can you picture them even trying to leave the room? The detective testified that he questioned the respondents during the course of an investigation and that they were not in custody but that he was trying to ascertain whether they were responsible for all or just part of the damage. This questioning occurred after he had obtained their names from a third party. As to Bust, he asked Bust “ Had he done it? ” — and Bust admitted he had and described the incident. As to the other respondents, he questioned Billings at Public School No. 191 in the presence of a counsellor and obtained an admission. At the same time and place he questioned Alexander who denied being involved at 'all. He questioned Thomas at Public School No. 178 in the presence of a teacher, and he made a partial admission. Then he took the respondents into “ custody ” at school and went to the homes of the parents to inform them that their sons had been taken in custody. While the testimony on these points is incomplete, it presents an issue of fact upon which the respondents have a heavy burden and it is my opinion that this burden was not sustained since the manner of questioning of Bust and the others indicates that they were in custody to all intents and purposes. An officer could say that no one is in custody but is free to go until he obtains the information he requires and then make the arrest but here all these respondents were being questioned not in an investigative but in an accusatory manner from the start following leads, and following Escobedo *61 they were entitled to the warnings of Miranda, since the investigation was focused upon them.
This court realizes that it is stirring up a hornet’s nest with a multitude of problems for the police and the public. The court is not in sympathy with this doctrine and it accepts the reasoning in State v. Carlo (supra) as more beneficial to children, but it must follow Miranda. It believes that the doctrine will hurt, not help, children as well as expose the public to greater perils and risks. Moreover, it would seem to be contrary to the very purpose of this court which is to rehabilitate children and teach them to respect the rights of others and the truth and not to hide their wrongdoings under constitutional and technical safeguards, which in effect is teaching children a “ slick way” to escape their responsibility. The daily papers carried a report that the Board of Education of New York City sustained over one million dollars worth of damage due to broken glass in windows in 1966, and an additional one half million in property stolen by acts similar to those of these respondents. The fact is well known that property in this city today must be protected if it is to remain intact. This is a sad commentary upon our people but true. Perhaps the condition could be corrected if people taught their children to admit their acts when they are wrong. There seems to be more concern and sympathy for the wrongdoer than for the injured. During the past month this Judge had heard cases of a serious stabbing of a pedestrian with an 8-inch dagger for no reason, which put the victim at death’s door for some days; a police officer guarding a fire alarm box, who was struck on the head with a bottle by one of a group of juveniles and confined to the'hospital for weeks; a lady’s pocketbook snatched — when she tried to protect herself she was thrown to the ground, fracturing her shoulder and requiring hospitalization; elderly men and women walking in daylight on busy city streets set upon by groups of young juveniles, and one who was grabbed around the neck from behind was thrown to the pavement and knocked unconscious, and as one witness described it: “ they went through his pockets like vultures ” ; a police officer dressed as a woman attacked by a group of juveniles at night while walking down a city street, and passengers on city subways subjected to beatings^ and insults. Many respondents in similar cases will go free under Miranda. Presently the Borough President of Brooklyn and aroused citizen groups are seeking more protection so people can walk the streets in safety.
Although the courts must be concerned with the rights of the wrongdoers and see that they are protected to the full extent of *62 the law, yet the courts should be equally diligent to protect the rights of the injured. Perhaps, the courts have gone too far in this regard for the wrongdoers. I believe that they have.
However I may feel, I must and shall apply the law as the Supreme Court has made it; and so the motion to suppress the officer’s testimony is granted and since there is no other evidence, the petitions must he dismissed.