500 S.W.2d 275 (1973)
In the Interest of K. W. B., a child under seventeen years of age.
No. KCD 26307.
Missouri Court of Appeals, Kansas City District.
October 1, 1973.
*276 Clifton E. Curtis, David Wm. Kierst, Jr., The Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant.
Michael E. Reardon, Law Student Certified under Mo. Sup. Ct. Rule 13, representing Juvenile Officer, Robert Popper, Supervising Atty., Tom Day, Pros. Atty., Jackson County, Kansas City, for respondent.
Before WASSERSTROM, P. J., and SHANGLER and SWOFFORD, JJ.
SHANGLER, Judge.
The appeal of K.W.B., a juvenile of 15 years of age, is from an order which placed him in a juvenile institution in Jackson County and which, additionally, imposed a suspended commitment to the Missouri Training School for Boys.[1] The *277 order, in effect, re-placed appellant in the same county institution to which he had been adjudicated, and then released in the continuing jurisdiction of the juvenile court, under a prior petition.
This appeal results from the exercise of jurisdiction upon allegations of conduct against appellant which, if committed by an adult, would be the felony of robbery in the first degree. It was specifically alleged that K.W.B., in concert with others, assaulted with a deadly weapon one Joe Cannova at his tavern in Kansas City, Missouri, and robbed him of money.
The hearing on the petition was in two phases, adjudicatory and dispositional. On the initial adjudicatory phase, Joe Cannova testified that at about 9:00 P.M. on February 10, 1972, he was tending bar when four males entered the tavern. One of them pointed a handgun at Cannova and ordered him to lie on the floor behind the bar. Meanwhile the men moved along picking up change from the top of the bar and took some money from the purse of a woman who was in the bar with her husband. The husband identified himself as a police officer, drew his revolver, and the robbers fled. He was shot in the pursuit. At the juvenile court hearing Cannova was the only witness called who was present at the robbery. He was unable to identify K. W.B. as a participant.
At an unspecified time that same evening, K.W.B. was picked up by Kansas City police officers and taken to the Youth Unit at department headquarters. At a time also unspecified, Charles Gardner, a Deputy Juvenile Officer on night intake duty at the Jackson County Juvenile Court, was requested by the police to come to the Youth Unit. The record does not indicate at what time Gardner arrived at police headquarters, nor is the sequence of events thereafter clear, but interrogation of the juvenile followed, his signed waiver of rights to an attorney and to remain silent was obtained, as well as his confession to the robbery. At the adjudicatory hearing the juvenile objected to the confession on the ground that the waiver was not validly made. The rest of the adjudicatory phase was given over to the determination of that issue.
The evidence in support of the waiver came from Charles Gardner, the deputy juvenile officer. He conceived the reason for his presence at the police department was to give the juvenile the Miranda warnings so that the police could then take his statement. The warning and waiver form which the boy eventually signed recited:
I have been advised that I have a right to remain silent; that any statement I make may be used as evidence against me in court; that I have a right to the presence of an attorney, either retained by me or one appointed for me without cost to me, and that he can be present while I am being questioned.
I have also been told that I can stop making a statement at any time but am willing to make such a statement and do not want a lawyer.
On direct examination Gardner testified that he went over the contents of the waiver form with the juvenile, sentence by sentence, and that the juvenile, who had been given a copy with which to follow the explanation, gave no indication that he did not understand it. Nor did the boy at any time indicate that he wanted a lawyer. Upon further examination, however, Gardner acknowledged that the boy had difficulty reading and examining the waiver, that he spent half an hour"an extremely long timein explaining to [K.W.B.], line for line, word for word" the contents of the document. Gardner also acknowledged, under questioning of the court, that he became aware of the boy's difficulty when K.W.B. could not read the copy of *278 the waiver Gardner had furnished him. Gardner expressed his opinion, however, that K.W.B. understood the rights warning before signing the waiver, but did not explain the basis for his conclusion. Nor did he say what his explanation of rights consisted of other than the verbatim reading of the printed waiver form.
K.W.B. was questioned on his waiver of rights. It was his testimony that although the Miranda warnings were read to him, he did not understand them. He signed the waiver after about one-half hour of interrogation and explanation. In response to the court's inquiries, K.W.B. said that he did not read the waiver statements he had signed because he could not read. In further response, he said he did not understand that he did not have to make a statement or that any statement made could be used against him, and was not informed that he would be furnished counsel if he did not have one. He answered the court further that Gardner had told him he could have a lawyer or his mother present at the interrogation, and K.W.B. told him he would rather have his mother. [Gardner had testified that the boy told him he did not want his mother present or an attorney either.] Gardner left the interrogation room for a few minutes, apparently to telephone K.W.B.'s mother, and during his absence the police continued to question the boy. When Gardner returned he told the boy his mother was not coming but gave no reason. Evidently, soon afterwards, K. W.B. signed the written waiver form.
The boy's mother testified that Gardner called her at home on February 10, 1972 at about 11:00 P.M. and asked her to come to the station. Gardner's request, she said was not for her presence at the waiver of rights, but to pick up her son. She did not refuse to come, but told Gardner that she did not have a way to get there. She had no neighbors and her sister, her only relative, worked at night. She testified that she did not understand the charge against her son was serious; had she known, she would have gotten there by some way. She thought that Gardner would send someone for her if her presence was important.
Gardner had no recollection of the details of his conversation with K.W.B.'s mother. At first, he expressed doubt that he had called her at all. He then testified that he would have telephoned her as a matter of standard procedure. It was the standard procedure to call the parent of a child in custody, explain the offense, and ask the parent to be present. Once, Gardner testified that he was "pretty sure" the mother had refused to come to the station. Thereafter, however, he testified repeatedly that he had no recollection of the particulars of his conversation with K.W.B.'s mother. He could not recall whether she had refused to come, nor whether she had told him she had no way to the station, nor whether he had either offered or refused her transportation.
At the adjudication of the waiver issue, under questioning of the court, it became apparent that the juvenile was suffering from dyslexia, an inability to read understandingly due to an impairment of the central nervous system.[2] It developed also that Gardner, the deputy juvenile officer conducting the waiver interrogation, had the same affliction and so did his children, but that they had become equipped to read through special training. Gardner recognized K.W.B.'s reading difficulty, but was certain nonetheless that the boy "understood what he was doing" when he signed the waiver.
The court determined that K.W.B. had made a valid waiver of rights and that his confession was freely and voluntarily given. The confession was the only evidence at the hearing which linked K.W.B. to the assault and robbery.
The first contention made by appellant is that in the totality of the circumstances the *279 Miranda warnings given to K.W.B. were inadequate and thus the confession was admitted in violation of his Fifth, Sixth and Fourteenth Amendment rights. Cognately, the argument is made that the proponents of the juvenile court petition failed their burden to prove that K.W.B. voluntarily, intelligently, and understandingly waived his right to counsel and privilege against self-incrimination.
In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), determined that where a juvenile court proceeding may result in loss of liberty to a juvenile, l. c. 55 [33, 34], 87 S.Ct. l.c. 1458, "the constitutional privilege against self-incrimination is applicable . . . as it is with respect to adults". The court also recognized the relevance of the Miranda rules [Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966)] in determining the validity of the process by which the trial admissions of a juvenile are obtained. In re Gault, supra, 387 U.S. l.c. 44 [22], 56 [35, 36], 87 S.Ct. 1428. While the concern of the Gault court was with the procedures and constitutional rights applicable at the adjudicatory phase of juvenile court proceedings, there is logical reason why the rationale which applies the guarantee against compulsory self-incrimination in the light of Miranda to the trial itself should apply to the pre-trial investigatory phase of the juvenile process as well. A coerced confession affects the integrity of the fact-finding process in court. Thus the requirement of Miranda for adequate warnings to protect against self-incrimination and that advisement of right to counsel be given a suspect under custodial interrogation was designed to protect the fairness of the trial itself. Miranda v. Arizona, supra, 384 U.S. l.c. 466, 86 S.Ct. 1602; Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
The courts have generally concluded, without further rationale, that the requirements of Miranda apply to the interrogations of children in the juvenile process. In re Rust, 53 Misc.2d 51, 278 N.Y. S.2d 333, 340 [3] (Fam.Ct.1967); In re Creek, 243 A.2d 49, 50 [1] (D.C.Ct.App. 1968); In re Teters, 264 Cal.App.2d 816, 70 Cal.Rptr. 749, 751 [1] (App.1968); Lopez v. United States, 399 F.2d 865 (9th Cir. 1968); Leach v. State, 428 S.W.2d 817, 820 [5] (Tex.Civ.App.1968); State v. Prater, 77 Wash.2d 526, 463 P.2d 640, 644 [3] (1970). The decisions of our own courts have assumed the applicability of Miranda to such interrogations. State v. Stevens, 467 S.W.2d 10, 17 [3-5] (Mo. 1971); State v. Sinderson, 455 S.W.2d 486, 494 [6] (Mo.1970).
The courts have held almost without exception that the condition of infancy, by itself, is not sufficient to invalidate an otherwise competent waiver of constitutional rights. State v. Sinderson, supra, l. c. 494 [6]; State v. Taylor, 456 S.W.2d 9, 10 [1] (Mo.1970); Commonwealth v. Darden, 441 Pa. 41, 271 A.2d 257, 260 [1-3] (1970); People v. Stephen J. B., 23 N.Y.2d 611, 615, 298 N.Y.S.2d 489, 246 N.E.2d 344, 348 [6] (1969); White v. State, 13 Md. App. 1, 280 A.2d 283, 289 [4] (1971); People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 599 [17], 423 P.2d 202 (1967); Lewis v. State, 288 N.E.2d 138, 142 [5] (Ind.1972). These courts have recognized also that in the determination of waivers of constitutional rights, juveniles are not to be "judged by the more exacting standards of maturity". Haley v. Ohio, 332 U.S. 596, 599, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948). Rather, because children are "easy victims of the law", their confessions are received in judicial proceedings with great caution. Haley v. Ohio, supra, l. c. 599, 68 S.Ct. 302; In re Gault, supra, 387 U.S. l. c. 45, 87 S.Ct. 1428. It is the sense of Gault that the procedures of the juvenile court process must allow special protection to ensure that the admissions of juveniles are free of coercion and their waivers of Fifth and Sixth Amendment rights are intelligently and knowingly made, l. c. 55 [33, 34], 87 S.Ct. l. c. 1458:
We appreciate that special problems may arise with respect to waiver of the privilege *280 [against self-incrimination] by or on behalf of children, and that there may well be some differences in techniquebut not in principledepending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reasons when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.
The question remains: in the absence of a lawyer, and conformably to the requirement of Gault for fundamental fairness in the juvenile court process and the purposes of our juvenile law, how may a minor validly waive his rights to counsel and to remain silent after the accusatory stage has been reached in such proceedings?
Appellant contends that the competence of a juvenile's waiver, and hence the admissibility of his confession, is determined by the totality of the circumstances under which it was given. In support of this contention, appellant cites Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) and Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), both of which were decided before Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Haley, a fifteen year old boy was questioned from midnight until 5 A.M. by relays of policemen, without counsel, and then held incommunicado after signing a typed confession. In Gallegos, a fourteen year old boy confessed immediately after being arrested, but was held incommunicado for five days until he signed a statement. In each case the confession was held invalid because the result of police coercion. Gallegos declared the rule 370 U.S., l. c. 55 [4], 82 S. Ct. l. c. 1213:
There is no guide to decision of cases such as this, except the totality of circumstances. . . The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friendall these combine to make us conclude that the formal confession on which this conviction may have rested. . . was in violation of due process.
The test for the admission into evidence of extrajudicial confessions, prior to Miranda, was whether in the totality of the circumstances, the confession was voluntary, "[t]he product of an essentially free and unconstrained choice by its maker". Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). Miranda, which requires not only that an accused be advised of his rights to counsel and to remain silent but that the waiver of these rights be intelligently and knowingly made, has shifted the focus of inquiry from the conduct of the police to the capacity of the accused. See, 5 Williamette L.J. 66, 78 (1968). A number of recent decisions have considered factors of age, education, intelligence, experience and ability to comprehend as among the totality of circumstances which bear on a valid waiver of the Miranda rights by a juvenile. People v. King, 27 Mich.App. 619, 183 N. W.2d 843, 845 [1] (1971); Commonwealth v. Darden, 441 Pa. 41, 271 A.2d 257, 260 (1970); West v. United States, 399 F.2d 467, 469 [1] (5 Cir. 1968); Vaughn v. State, 456 S.W.2d 879, 882 [3] (Tenn.Cr. App.1970). It is evident from the cases which have been decided in the wake of Miranda, however, that the minority of an accused continues to be the most troublesome factor in the determination of whether waiver of constitutional rights has been competently made.
On this appeal there is neither assertion nor evidence that the confession of K.W.B. was coerced. The question is only whether K.W.B. had the capacity to, and *281 did, intelligently and knowingly waive his rights to counsel and to remain silent. The respondent does not dispute that Miranda [384 U.S. l. c. 475, 86 S.Ct. 1602] places "a heavy burden [of proof]" upon the governmental proponent of waiver of constitutional rights by an accused at custodial interrogation, but contends that it met that burden by the testimony of deputy juvenile officer Gardner of the oral waivers given him by appellant. That testimony, however, merely recites a summary of the warnings given while acknowledging great difficulty in making them understood. Gardner testified that he explained K.W.B.'s rights to him, but we are not told what that explanation was. He testified also that K.W.B. understood those warnings, but we do not know whether the warnings were in language suitable to a person of K.W.B.'s experience and obvious learning disabilities or was merely an oral rendition of the boilerplate printed recitation of rights signed, but not read, by the juvenile. "The purpose of the Miranda warnings is to convey information to the suspect. Plainly, one who is told something he does not understand is no better off than one who is told nothing at all." United States v. Frazier, 476 F.2d 891, 900 (D.C.Cir., 1973), Bazelon, C. J. dissenting. The unsupported testimony of the deputy juvenile officer that he believed K.W.B. understood his rights and waived them does not discharge the burden of proof the law has placed upon respondent. State v. Davis, 73 Wash.2d 271, 438 P.2d 185, 193 [8] (1968). At the dispositional phase of the hearing, Gene Morgan, the deputy juvenile officer who had supervised K.W. B. under the prior order of adjudication, testified that the juvenile had dropped out of school because of his inability to read. The therapist who had treated K.W.B.'s disability under the auspices of the juvenile court evaluated his as a pre-primer ability to read. Although it is apparent that a social file concerning K.W.B. had been compiled under the prior adjudication and was available as a source of relevant personal information, none was submitted on the proof of the critical issue of the juvenile's capacity for waiver of constitutional rights. The only evidence which bears directly on the question casts doubt that K.W.B. had such capacity.
The trial court's finding of waiver is not supported under the totality of circumstances standard of proof.
Our determination that respondent has not proved a valid waiver, however, rests on a more fundamental basis. It is consistent with the protective ethic of our juvenile law that at the accusatory stage of the process a juvenile have the special benefit of parental guidance as to whether he will waive his constitutional rights to an attorney and to remain silent. The juvenile law lays great stress upon the important role of the parent in the juvenile process. A parent must be notified as soon as possible when the child is taken into custody. § 211.031, RSMo 1969, V.A. M.S. After the assumption of judicial custody, and pending court appearance, a child is to be returned to the parent if at all possible. § 211.041, RSMo 1969, V.A.M.S. Even more pertinently, the parent or other custodian must be notified to appear with the child for the adjudication of the petition. § 211.101, RSMo 1969, V.A.M.S. This statutory section comports with the holding of Gault that the adjudication of a petition in the juvenile court is a critical stage of the proceedings and requires opportunity for presence of the parent as a trial right of the juvenile. In re Gault, supra, 387 U.S. l. c. 33 [5-11], 87 S.Ct. 1428. Miranda determined that custodial interrogation, although a prejudicial event, is also critical and entitles an accused to his trial rights because a confession bears on the integrity of the fact-finding process in court. Miranda v. Arizona, supra, 384 U. S. l. c. 466, 86 S.Ct. 1602; Escobedo v. Illinois, 378 U.S. 478, 488 [4], 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It would not be reasonably within the purposes of our juvenile law to extend to the child the special *282 protection of parental presence at one critical stage of the juvenile process and withhold it at another. And since a juvenile who confesses at the accusatory stage has, in most instances, already had his trial, to deprive him at that stage of parental assistance would render meaningless the presence of the parent at the trial considered necessary for his protection by § 211.101, RSMo 1969, V.A.M.S.
Although no Missouri court has been presented with the question of whether a child amenable to the juvenile court process, and unrepresented by an attorney, may be subjected to custodial interrogation in the absence of a parent or friendly adult, those cases which have dealt with confessions from such questioning have given much weight to the presence of a supportive adult in determining whether the confession of the juvenile was voluntary and the waiver of Miranda rights understandingly made. State v. Stevens, supra, 467 S.W.2d l. c. 18 [5]. There is reason to believe that Miranda warnings administered directly to a juvenile of K.W.B.'s years do not provide the protection intended for an adult. And there is evidence that even when given "in terms that reflect the language and experience of today's juveniles" [In re Dennis, 70 Cal.2d 444, 75 Cal.Rptr. 1, 450 P.2d 296, 308 n. 13 (1969)], the Miranda warnings do not, without adult advice, convey to juveniles a working understanding of the consequences of confession or the services a lawyer could provide.[3] Lewis v. State, 288 N.E.2d 138, 141 [1-4] (Ind.1972); People v. Burton, 6 Cal.3d 375, 99 Cal.Rptr. 1, 491 P.2d 793, 797 [3] (1971).
There are obvious reasons why a juvenile officer who gives the Miranda warnings to a child suspect does not suit the role of parental protector. "A father, inquiring as to possible misconduct of his son, would feel a bit absurd if he told the son the truth may be used against him, that he has a right not to answer, and that he may consult counsel before deciding whether to talk." In the Interest of Carlo, 48 N.J. 224, 225 A.2d 110, 121 (1966), Weintraub, C. J. concurring. The threat of punishment for telling the truth, which these warnings convey, can scarcely be understood by a child as an expression of a parental solicitude. More fundamentally, however, the normal impulse of a child in trouble is to turn to a parent for help, and (People v. Burton, supra, 491 P.2d l. c. 797[3]):
[i]t appears to us most likely and most normal that a minor who wants help on how to conduct himself with the police and wishes to indicate that he does not want to proceed without such help would express such desire by requesting to see his parents. For adults, removed from the protective ambit of parental guidance, the desire for help naturally manifests in a request for an attorney. For minors, it would seem that the desire for help naturally manifests in a request for parents.
The presence of a juvenile's parent at police questioning will provide the advise and protection that the juvenile officer cannot, consistently with his other duties provide. The parental presence would also lessen the atmosphere of coercion and fear which inheres in any such setting.
Our juvenile law recognizes that "at the juvenile level, the problem [of criminal activity against the social body] is best proceeded against on a rehabilitative basis under special procedures for the benefit of the child." State v. Arbeiter, 408 S.W.2d 26, 30 [3] (Mo.1966). The interest *283 of the State, as parens patriae, in the welfare of its children was most recently reaffirmed legislatively by the enactment in 1969 of an amendment to § 211.271(3) which prohibits the use in the criminal process of admissions, confessions, and statements given by the child in the juvenile process.[4] This amendment is a clear direction that any confession taken from a child subject to the juvenile process shall be used only within the rehabilitative framework of the juvenile law. See, State v. Richardson, 495 S.W.2d 435, 438 [5] (Mo. banc 1973). The effect of this enactment is to reaffirm as well that "`[t]he need for special treatment begins at the instant the juvenile is contacted by peace officers'", at the very earliest moment of intake. State v. Arbeiter, supra, 408 S.W.2d l. c. 30 [2]; In re F.C., 484 S.W.2d 21, 25 [10] (Mo.App.1972). It is entirely congruous with this legislative commitment to rehabilitation, and the court's own parental role in such purpose, that a child shall have the benefit of the presence and protection of his natural parent at accusatory interrogation while in the custody under the juvenile law.
We hold, therefore, that in the absence of an attorney, a confession of a child which results from custodial interrogation shall not be used against him in a juvenile court proceeding unless both he and his parent, guardian or adult friend were informed of the juvenile's rights to an attorney and to remain silent. Furthermore, the child must be given an opportunity to consult with his parents, guardian, adult friend, or attorney as to whether he wishes to waive those rights. Lewis v. Indiana, 288 N.E.2d 138, 442 [6] (Ind.1972); Matter of William L., 29 A.D.2d 182, 287 N.Y.S.2d 218, 221 (1968); Daniels v. State, 226 Ga. 269, 174 S.E.2d 422, 424 (1970). Such a rule proceeds on the premise that [In the Interest of Carlo, 48 N.J. 224, 225 A.2d 110, 121 (1966), Weintraub, C. J. concurring]
[a] child can be rehabilitated only in the face of the truth, and that the process would be undue which harbors the danger of falsity. If a confession is obtained in circumstances which cast doubt upon its truthfulness, it has no place in the juvenile process . . . Thus, there should be every assurance that the juvenile was not led into a false account, and to that end . . . the police should see that a parent or some relative or friend is present, if it at all feasible, to allay the fear or pressure a youngster could feel in strange hands and a strange setting.
From the record before us we surmise that the procedure we have defined for waiver of Miranda rights in juvenile process interrogations, in substantial form, had already been established in the juvenile court from which this appeal comes. There was evidence of a standard procedure for juvenile court personnel at police interrogations of juveniles which required the parent to be informed of the custody of the child, the nature of the conduct concerning which the questioning was sought, and request for the presence of the parent. There was evidence also that police transportation was available to the parent for that purpose. It is fairly inferable as well that the child's rights to counsel and to remain silent were usually explained both to the child and to the parent. It is clear, however, that K.W.B. was denied the benefit of even this procedure.
On this de novo review we conclude that K.W.B.'s mother was not effectively informed of her right to be present *284 at the interrogation, nor of her son's rights to counsel and to remain silent, nor of her right to aid her son in the waiver of those rights. The testimony of deputy juvenile officer Gardner that K.W.B.'s mother was informed of the son's jailhouse custody and of the nature of his unlawful conduct, but refused to come, was vague and equivocal and not probative. Nor was there indication that conflict of interest could result between the mother and child from his grant or withholding of waiver.
Our determination of these issues is dispositive of this appeal so we do not consider a remaining point appellant raises. The judgment of the trial court is reversed.
NOTES
[1] In an opinion adopted concurrently, In Matter of A.N., 500 S.W.2d 284, 1973, this court has determined that Chapter 211, RSMo 1969, does not empower a juvenile court to suspend the execution of a commitment to the Missouri Training School for Boys, nor to allow probation from such a commitment, nor to order concurrently both a commitment to the training school and another disposition. Since in this case, the court has executed only the order of placement to the county institution, we treat as surplusage the order of commitment to the Missouri Training School for Boys and the suspension of the execution of that commitment.
[2] Dorland's Medical Dictionary, 1957 ed.
[3] A Study of Juvenile Waiver, 7 San Diego L.Rev. 39 (1970), is a report of a test by two lawyers made among 90 juveniles using a simplified Miranda warning to compare their understanding of that warning with the standard formal warning. The authors concluded, l. c. 54: "[A] small percentage of juveniles is capable of knowingly and intelligently waiving Miranda rights. The great majority should be advised and counseled carefully if they are to understand their rights completely." See, also, Univ. of Ill. Law Forum, pp. 625, 629 (1972); Waiver in Juvenile Court, 68 Col.L.Rev. 1149 (1968).
[4] "3. After a child is taken into custody as provided in section 211.131, all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."