No. 79,358

In the Matter of B.M.B., *Appellant.*

(955 P.2d 1302)

Opinion filed March 13, 1998.

*Richard Ney*, of Law Offices of Richard Ney, of Wichita, argued the cause and was on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: B.M.B., a 10-year-old boy, appeals from his adjudication of one count of rape. Appellant's motion to transfer from the Court of Appeals to this court was granted.

On May 14, 1996, J. was 4 years old. That day, she had been outside playing when she came into the house upset and crying. J. said that a boy had tried to kiss her. Her parents had told her to scream "if anyone ever touched her in any way that she did not like."

Later the same day, J. and her 7-year-old brother, C., were playing with B.M.B. in a load of sand that had been delivered to a neighbor, Paul Beyer, who was constructing a pool.

C. and J. buried B.M.B. up to his waist in sand as B.M.B. sat with his legs extended in front of him. Then J. sat down near B.M.B., in the same position and facing the same direction he faced, and C. began burying her with B.M.B.'s help. C. was using his hands to scoop sand into a bucket, and B.M.B. was helping by pushing the sand over toward the bucket. While C. was burying J., he saw a worm in the bucket and dumped the sand back out near J.

When J. had been buried up to her knees, she screamed and ran into her house. According to C., B.M.B. said there was a bug holding onto J.'s cheek.

After Beyer began working in the back yard, he heard J. crying. Approximately 20 minutes later, he heard J. scream. Beyer described the scream as "just shrilling." He saw J. running toward the house. He also saw C. and B.M.B. standing near the sand. Beyer did not see anyone else.

J. was crying and upset when she got into her house. She told her mother that a boy had tried to "put his finger up [my] butt." J.'s mother testified that J. told her the boy who had tried to kiss J. was not the same one who was in the sand with her.

J.'s mother started brushing sand off her, then removed J.'s outer pants and noticed sand inside her panties. She asked J. how sand got there, and J. told her that "the black man tried to put his finger up her butt." When J.'s mother noticed fresh blood in the crotch of J.'s panties, she and her husband called the police. At the suggestion of the police, they took J. to a hospital to be examined.

The nurse who examined J. asked her if she knew why she had been brought to the hospital. J. had told her, "That boy put his finger in my butt and made me bleed." With no further prompting,

J. had continued, "Then he hit me in my face." J. said he hit her "[because] I won't kiss him. I don't like to kiss." When asked where she was hurt, J. had pointed to her vaginal area. The nurse examined J.'s perineal area with a binocular microscope and found a laceration, some broken blood vessels beneath the skin, and sand-like gravel. The injuries were recent and consistent with J.'s general description of what had happened.

C. told a police officer that he did not know of anything that B.M.B. had done to make J. cry. C. thought J. had cried out and run away because she was frightened by a bug he had seen on her. At B.M.B.'s adjudication hearing, J. testified that "me and the black man and my brother played in the sand." She testified that she got buried first, and B.M.B. "just sticked his finger in my bottom." She said that B.M.B. had touched her through the top of her shorts.

Detective Swanson testified that after B.M.B.was identified, he had called B.M.B.'s mother on May 20, 21, and 22. Each time he spoke to an unidentified person and left a message that B.M.B.'s mother should call him. Swanson had not tried to contact B.M.B.'s mother by going to their house. Swanson had not tried to get in touch with B.M.B.'s father because he had been told that the father was in prison.

The morning of May 23, J.'s father called Swanson to advise him that B.M.B. would be leaving the next day to spend the summer with his uncle in Arkansas. Without trying to contact B.M.B.'s mother again, Swanson went to the school where 10-year-old B.M.B. attended fourth grade. Swanson identified himself as a police officer and said that B.M.B. would be going with him to the Exploited and Missing Child Unit office because he needed to talk to B.M.B. about something that had happened. B.M.B. cried, but by the time they had driven to the office (about 20 minutes), he was calm. During the drive, Swanson asked B.M.B. about his upcoming trip to Arkansas. Swanson considered B.M.B. to be under arrest, but did not tell B.M.B. so.

At the police station, Swanson put B.M.B. into an interview room and advised him of his *Miranda* rights. He did this by having B.M.B. read the *Miranda* form, going over each sentence with him, and having B.M.B. initial each sentence. Swanson asked B.M.B. if

he wanted to have his mother present, and B.M.B. said that he did not. He began questioning B.M.B. at 9:55 a.m. and stopped at 10:33 a.m. About 20 minutes after the questioning began, someone knocked on the door. The tape recorder was then turned off for 7 minutes. Swanson was told that B.M.B.'s mother had called. Swanson testified: "I went and told [B.M.B.'s mother] that, indeed, I had [B.M.B.] at the interview—at the office. And then I went back, documented the time that I started the tape again, and continued the interview." The transcript of the taped questioning shows that Swanson received the message about B.M.B.'s mother at 10:14 a.m. and turned the tape back on at 10:21 a.m. The transcript also shows that Swanson did not tell B.M.B. that his mother had called or that she was on her way to the police station until after B.M.B. had made incriminating statements and was asking when he was going back to school. Swanson resumed questioning immediately and concluded it before B.M.B.'s mother arrived. Much of the text of the transcribed questioning is underlined. This note appears at the end of the transcript: "(Underlined corrections by Det. Swanson, 08-16-96)[.]" It is unclear exactly what that includes.

At the hearing on the motion for new trial, Dr. Mark Chaffin testified on B.M.B.'s behalf. He is a clinical professor of pediatrics and psychiatry at the University of Oklahoma, research director at the Center on Child Abuse and Neglect, and co-director of the Adolescent Sex Offender Treatment Program. He had read the transcript of B.M.B.'s questioning. Asked his opinion of the appropriateness or inappropriateness of the questioning, he stated:

"I've reviewed transcripts of many interviews in several other cases, as well as this one, interviews that I thought were both appropriate and inappropriate. This interview was a very difficult one. This transcript was a very difficult one to review. I have to say, unfortunately, it's probably the worst I've seen in my career. It was, at best, incompetent; at [worst], reprehensible. And I say that with a great deal of difficulty because I'm someone who works with abused children, who works with law enforcement people, who works with people who do this. I'm normally on the other side of these cases. This particular interview was beyond the pale. I'm familiar with the techniques used. I've attended conferences. I've collaborated with law enforcement people in their training of how to interview children. I'm familiar with the techniques that were used in these interviews. These are techniques that law enforcement people, to my knowledge, are trained to use with

adult suspects who are suspected of being sex offenders. They are wholly inappropriate for use with ten year old children. We have reams of research about the effects of coercive questioning, suggestive and leading questioning, pressured situations and the effects these have on children and how it's different from the effects they have on adults. Basically, these types of techniques, in my opinion, have no place in—in any kind of setting in use with children. They would likely lead—in fact, we really from a research perspective don't know the effects of this type of questioning because, typically, in the suggestibility and coercive questioning research that's been done, far less pressure has been exerted on children in those research studies because people didn't think it would be ethical to go this far with children just to see what would happen. Even in settings where less pressure, less suggestion and less coercion has been studied, we found substantial numbers of children will agree with things that are—that are factually inaccurate, will give assention to things, will nod and say 'Uh-huh' or will—will essentially agree to things or even come to believe things that are not true using far lower levels of pressure and suggestion than were used in this interview. This type of interview technique—if what one wants is a confession, this type of interview technique with ten year old children will get it. It will unfortunately, in my opinion, get it from the guilty and get it from the innocent. I think—my guess would be a substantial number—and I'm not talking about ten percent or fifteen percent. But a substantial number, perhaps as many as half, of all children interviewed in this way would have given some minimal agreement to what was being suggested to them with this level of pressure and coercion. So my opinion—I guess my opinion of this interview, based on the transcript and understanding that transcripts don't tell you everything in an interview—the transcript is flat. It reads like the record is flat. It doesn't give you intonation. It doesn't give you non-verbals. It doesn't give you the way the people were conducting an interchange. But simply even with those limitations, my evaluation of this interview would be, is, obviously fairly negative."

We first consider if B.M.B.'s waiver of his rights was knowingly and voluntarily given so that his statement to police was properly admitted at trial. "If the findings of the trial court on a motion to suppress evidence are based on substantial evidence, this court on review will not substitute its view of the evidence for that of the trial court." *State v. Salcido-Corral*, 262 Kan. 392, Syl. ¶ 6, 940 P.2d 11 (1997). But where the accused is a juvenile, this court exercises "the 'greatest care' in assessing the validity of the confession." *State v. Robinson*, 261 Kan. 865, 888, 934 P.2d 38 (1997) (quoting *State v. Young*, 220 Kan. 541, 553, 552 P.2d 905 [1976]). In the present case, the trial judge denied the juvenile's motion to suppress in the following words:

"When I apply the factors outline in *Young* to this factual situation, I find the following: That the length of the questioning weighs toward admitting the statement made by [B.M.B], as it appears it was approximately thirty-one minutes in length, if you take out the time that the Detective left the room. There certainly have been many interrogations that have lasted a matter of hours, closer to half a day, actually, off and on, with meal breaks, et cetera, and this is nowhere near that. [B.M.B]'s mental state appears to be relatively calm. Although he was described as tearful or crying as he left the school, that was apparently a situation that corrected itself upon getting into the Detective's car. I'm more impressed, however, with [B.M.B]'s comment that he would simply do his homework while waiting for paperwork to be processed, rather than being described as tearful or overwrought. There is no indication at this point that [B.M.B.] had any hesitation with regard to speaking to this Detective. I know nothing about [B.M.B]'s maturity, other than he obviously can write and has signed the document, Exhibit No. 5, [and] dated it appropriately. On the other hand, he is ten years old—or was ten years old at the time. I find significant that the Detective did, indeed, attempt to reach [B.M.B.]'s mother and that apparently he only took the action of picking up [B.M.B.] at school when it appeared [B.M.B.] was going to be leaving the jurisdiction of the Court. The total circumstances would indicate that this is a voluntary statement. If, after hearing the statement, I see anything or hear anything in there to indicate otherwise, on my own I would exclude it. At this time it comes in. It's in."

In the case referred to by the trial court, *State v. Young*, 220 Kan. 541, the 16-year-old defendant's conviction of felony murder was affirmed. In considering Young's motion to suppress his confession, the court concluded that an accused juvenile's pretrial waiver of his privilege against self-incrimination was controlled by *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), and *State v. Hinkle*, 206 Kan. 472, 479 P.2d 841 (1971). *Young*, 220 Kan. at 546. This guiding principle was quoted from *In re Gault*:

" '. . . If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' (p. 55.)" 220 Kan. at 546.

In making its determination, the court considers the totality of the circumstances. 220 Kan. at 546. The factors considered in *Young* were:

- the age of the minor,

- the length of the questioning,
- the youth's education,
- the youth's prior experience with the police, and
- the youth's mental state.

The inquiry, if this court is to apply the generally accepted standard of review of a trial court's ruling on a motion to suppress evidence, is whether there is substantial evidence in the record on appeal to support the trial court's findings. B.M.B.'s counsel suggests that there is not. We agree. Distilled from the trial court's ruling from the bench, the court identified the evidence of the following circumstances:

- the age of the minor—B.M.B. was 10 years old.
- the length of the questioning—interrogation lasted 31 minutes. It was brief compared to many interrogations.
- the youth's education—"I know nothing about [B.M.B.'s] maturity, other than he obviously can write and has signed the document [and] dated it appropriately."
- the youth's prior experience with the police—no finding.
- the youth's mental state—B.M.B. was "relatively calm." He was not "tearful or overwrought."

The trial court correctly stated that B.M.B. was 10 years old. His age, however, seems not to have been considered material to the trial court's other findings.

The trial court correctly stated that the formal questioning lasted 31 minutes. B.M.B. also was alone in the car with the officer for approximately 20 minutes, and then he was in the interview room for 38 minutes and was questioned for 31 minutes. The trial court seemed to find the length of the questioning unremarkable relative to other interrogations. The trial court, however, made no effort to evaluate the length of the interrogation in light of B.M.B.'s age. Nor did the trial court take into account the length of time B.M.B. was in the officer's sole custody.

The trial court did not mention that B.M.B. was in the fourth grade, but noted that he could write. In other words, the trial court failed to make any finding of any significance with respect to

B.M.B.'s mental capacity. Moreover, the trial court professed total ignorance "about [B.M.B.'s] maturity."

The trial court did not mention whether B.M.B. had any prior experience with the police. The State contends that, "[b]y his own admission, the respondent had been in trouble with the police before for writing in the cement." The State does not contend, however, that this "fact" appears in the record on appeal except in B.M.B.'s statement, the admissibility of which is at issue. There is nothing in the record from which it can be determined what the nature or extent of the encounter was.

The factor that most impressed the trial judge was B.M.B.'s mental state, which she regarded as being "relatively calm." She seems to have based her opinion on his demeanor *following* the questioning rather than preceding or during it. In this regard, the trial judge stated:

"Although he was described as tearful or crying as he left the school, that was apparently a situation that corrected itself upon getting into the Detective's car. I'm more impressed, however, with [B.M.B.'s] comment that he would simply do his homework while waiting for paperwork to be processed, rather than being described as tearful or overwrought."

Not only is the basis for the trial court's opinion of questionable relevance due to its occurring after the interrogation, but also it is not supported by the record. The basis for the trial judge's opinion is the testimony of Detective Swanson. The transcript of Swanson's exchange with B.M.B. at the close of the questioning does not substantiate Swanson's trial testimony about B.M.B. stating that he would do his homework. At the end of the interrogation, Swanson said, "I'm going to let you sit back here for a few minutes, okay and I'm going to do some paperwork and stuff and your mom should be here [in] a short time and uh, we'll get things taken care of okay?" On the record, B.M.B. responded, "Can I go sit back where I was?" Swanson asked, "You mean out front?" B.M.B. said yes, and Swanson said he could. There is no mention of homework. At trial, Swanson testified: "I had told him I had some paperwork to do and he said he was going to work on his homework."

The trial court failed to make any finding at all for one of the *Young* factors—prior experience with the police—and the finding

on B.M.B.'s education is of little value. There is a serious question whether a basis of substantial evidence can be said to exist for the trial court's finding with regard to B.M.B.'s mental state. In addition, it appears that the trial court assigned weight to factors that should not have been in the equation. For example, the trial court stated: "I find significant that the Detective did, indeed, attempt to reach [B.M.B.'s] mother and that apparently he only took the action of picking up [B.M.B.] at school when it appeared [B.M.B.] was going to be leaving the jurisdiction of the Court." There is nothing material to the voluntariness of B.M.B.'s statement in this finding. There certainly is no mention of Detective Swanson's failure to try to arrange to meet B.M.B.'s mother at the school or to secure her presence at the police station. Nor is there any mention of his deliberately continuing and concluding B.M.B.'s questioning after his mother called the police station to say that she was on her way there, presumably after being informed by school officials that B.M.B. had been taken from his classroom.

In addition to these shortcomings in the trial court's consideration, B.M.B.'s counsel argues that the detective's demeanor and conduct was inappropriate and should be taken into account as tending to make the statement involuntary. Counsel contends that Swanson misled B.M.B. into thinking that the situation was not serious by failing to tell B.M.B. he was under arrest and facing a very serious charge and by acting as if he were a pal rather than a law enforcement officer. Swanson's testimony and the transcript of the taped questioning support the contentions. In the first regard, Swanson testified that he considered B.M.B. to be under arrest when they left the school. Swanson admitted, however, that he did not tell B.M.B. When B.M.B. asked Swanson during the questioning whether he was in trouble, Swanson did not give him a direct answer. Instead he suggested to B.M.B. that any trouble he might be in would be created by someone other than Swanson and concluded by assuring B.M.B. he would be all right:

"Well, anytime, anytime that we do something wrong, there's, there's a price that we pay but I'm not the one that's going to do that. I don't make that decision. What I do is get all the fact[s] and I present them to other people and they make that decision. Okay, but I'll tell you this. You're going to be [all right]."

In the second regard, Swanson cajoled B.M.B. during the questioning by asking the 10-year-old boy things like, "You're not married are you? Just checking." He also asked, "Have you ever been in the military?"

B.M.B.'s counsel also contends that Swanson coerced and suggested the contents of B.M.B.'s statement to him so that it was not the product of B.M.B.'s own mind or will. Counsel singles out the following response made by Swanson to B.M.B.'s denial of wrongdoing:

"Well, let me tell you something, okay? I didn't bring you down here to ask you if you did it. Okay? I brought you down here to tell me why you did it. See, because she went to the doctor and all you know and she told me what happened and I talked to the doctor and the doctor you know she, she found hurt."

Examination of the transcript also shows that a short time later, with B.M.B. persisting in his denial of wrongdoing, the following exchange occurred:

"JS: Let me ask you something, okay? This is, it's not a matter of if, okay? Something happened and I don't think you meant to hurt the girl, but it did happen. So now what [we] have to do is we have to deal with what happened . . .

"BB: Yeah, but I didn't . . .

"JS: . . . Okay now listen . . .

"BB: . . . touch her . . .

"JS: . . . Now listen let me finish, okay? I don't think you meant to hurt her. There's a lot of reasons, you know you, there's a lot of reasons that could of happen. It could of been an accident. It could mean, you know you didn't mean to do it. I don't know, but it did happen and the girl got hurt and it's, it's just one of those things, but what [we] have to do when we make mistakes part of growing up is being able to admit that we make mistakes, okay?"

Then immediately after Swanson returned from talking to B.M.B.'s mother on the telephone, he began again:

"JS: Okay [B.M.B.], we were talking before okay? The fact of the matter is it happened, it was a mistake. You didn't mean to hurt her, did you? Okay and I didn't think that you did. You don't seem like a bad kid. You didn't want to hurt that girl. Was it this, you were curious or I mean it's, it's okay. I'm going [sic] to think badly of you. Like I said the only thing I deal with is the truth. That's the only thing I'm interested in. I mean was it an accident?

"BB: I don't see how I could

"JS: Huh?

"BB: I don't see how I could have touched though cause all I was doing was putting sand on her
"JS: _____ but your hand touched her down there, didn't it? You know, it's okay. You know sometimes these things really bother us and cause us problems, but if you talk to me and let me know we can help."

In addition to suggesting the accidental nature, Swanson also suggested specific actions to B.M.B.: "Well you know there was sand inside her panties and stuff too? So that makes [sense], if you were burying her in the sand, huh? Did your finger accidentally slide up her?" "So did your in finger accidentally go in the girl when you were playing with her?" "Yeah, do you remember which finger accident[ally] went in her?" "So basically what happened, is you accidentally stuck your left thumb up there while you were playing?" These suggestions by Swanson continued despite B.M.B.'s responding no less than seven times that he did not touch J. as suggested by Swanson.

Another problem with Swanson's questioning arises from his and B.M.B.'s not sharing a vocabulary for the subject. The resulting dialogue leaves the reader wondering whether the two are talking about the same thing and what B.M.B. actually said he did. For example, when Swanson asked B.M.B. about his finger or thumb being "up her" or "in the girl" or "in her" or "up there," did B.M.B. understand the officer to be referring to his finger or thumb being inside J.'s outer pants, panties, between her legs, in her vagina? There is no way to tell for sure what Swanson intended, what B.M.B. thought Swanson was talking about, or what B.M.B. was talking about.

The heavy burden of proving a knowing waiver by a juvenile is on the State. In order for B.M.B. to knowingly and intelligently waive his right to counsel and privilege against self-incrimination, the State must show that he fully comprehended the significance of those rights and the consequences of waiving them. Here, the trial court found that he did. We disagree. The trial court identified the relevant factors to be considered in making its determination but failed to consider the significance of those factors as applied to B.M.B. The trial court failed to consider the totality of the circumstances as it affected B.M.B.'s waiver, and its consideration of

the *Young* factors was superficial at best. In applying those factors to the circumstances in the present case, we have serious doubts whether B.M.B. fully understood his constitutional rights or the consequences of his waiving those rights. Based on the totality of the circumstances, we conclude that the State failed to show that B.M.B.'s statement was voluntary.

B.M.B.'s appellate counsel would have this court make a bright-line rule that a 10-year-old child, acting strictly on his or her own, is incapable of knowingly waiving rights. Counsel advocates that the advice of a parent, guardian, or legal custodian as well as that of an attorney should be a required condition for a child's knowing waiver of rights. He contends that "[a] number of states have found the interrogation of unadvised children to be illegal and have established absolute prohibitions against such acts either by statute or case law." According to B.M.B.'s counsel, the states with statutory restrictions on the admissibility of unadvised juvenile statements include Colorado, Connecticut, Iowa, Montana, North Carolina, Oklahoma, and West Virginia. With regard to judicially created restrictions, B.M.B.'s counsel states:

"The Massachusetts Supreme Judicial Court drew a legal bright line on this issue without a state statute. In *Commonwealth v. MacNeill*, 399 Mass. 71, 76-77, 502 N.E.2d 938, 942 (1987), the court held:

'We conclude that for the Commonwealth successfully to demonstrate a knowing and intelligent waiver by a juvenile, in most cases it should show that a parent or an interested adult was present, understood the warnings, and had the opportunity to explain his rights to the juvenile so the juvenile understands the significance of waiver of these rights. For the purpose of obtaining the waiver in the case of juveniles who are under the age of fourteen, we conclude that no waiver can be effective without this added protection.'

"In Missouri and in New York the rule is stricter. The appellate courts in those states have found that the interrogation of any juvenile requires the presence of his or her parent. *In re K.W.B.*, 500 S.W.2d 275 (Mo. App. 1973); *Matter of Aaron D.*, 30 App. Div. 2d 183, 290 N.Y.S.2d 935 (1968).

"The courts of Pennsylvania, Louisiana and Vermont have held that in order for prosecutors in their states to meet the burden of demonstrating that a juvenile's waiver was made knowingly and intelligently, they must affirmatively show that the juvenile engaged in meaningful consultation with an attorney or informed parent or guardian before he waived his privilege against self-incrimination. *Com-*

monwealth v. Smith, 472 Pa. 492, 372 A.2d 797 (1977); State in Interest of Dino, [359 So. 2d 586 (La. 1978)]; State v. Piper, [143 Vt. 468], 468 A.2d 554 (1983).

"Indiana, Georgia and Florida courts have concluded that the administering of Miranda warnings to a juvenile, without providing an opportunity to consult with an informed adult concerned primarily with the interest of the juvenile, is inadequate per se to create a knowing and voluntary waiver. Lewis v. State, 259 Ind. 431, 288 N.E.2d 138 (1972); Freeman v. Wilcox, 119 Ga. App. 325, 167 S.E.2d 163 (1969); J.E.S. v. State, [366 So. 2d 538 (Fla. Dist. App. 1979)]."

B.M.B.'s counsel brings to the court's attention a scholarly article by Thomas Grisso entitled *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis*, 68 Cal. L. Rev. 1134 (1980). Grisso describes studies performed by social scientists and lawyers at St. Louis University which were designed to provide judges, legislators, and attorneys with the information essential to consideration of the validity of *Miranda* rights waivers by juveniles. 68 Cal. L. Rev. 1134-36. In reporting the results of the studies, the author advocated different approaches for juveniles younger than 15 and juveniles 15 and older. 68 Cal. L. Rev. at 1160-66. He drew the following conclusions:

"The two empirical studies described in this Article indicate that younger juveniles as a class do not understand the nature and significance of their *Miranda* rights to remain silent and to counsel. Consequently, their waivers of these rights cannot be considered intelligently, knowingly, and voluntarily made. Compared with that of adults, the comprehension of these rights by younger juveniles is so deficient as to mandate a per se exclusion of waivers made without legal counsel by these juveniles. While older juveniles generally understand their rights as well as adults do, the results indicate that an adult level of understanding is an imperfect standard for determining the adequacy of older juveniles' comprehension. To properly protect the rights of older juveniles as well, per se exclusionary rules should be considered." 68 Cal. L. Rev. at 1166.

The State points out that the Georgia case cited by B.M.B.'s counsel has been superseded by Riley v. State, 237 Ga. 124, 127-28, 226 S.E.2d 922 (1976), in which the Georgia court held that the totality of circumstances must be taken into account in determining the admissibility of a juvenile's statement. The State also stresses the stability of the totality of the circumstances standard, which has been applied by this court since at least the Young decision in 1976 without modification by subsequent legislative en-

actment or court opinion. It may be noted that the recent cases cited by the prosecution involved a 17-year-old defendant, *State v. Orr*, 262 Kan. 312, 341, 940 P.2d 42 (1997), and a 14-year-old defendant whose mother was present when he first was questioned, *State v. Robinson*, 261 Kan. at 866. The prosecution cites no Kansas cases in which a suspect as young as B.M.B. was interrogated.

State courts have struggled with this issue and, as we previously noted, they are divided on whether to adopt a bright-line rule. The jurisdictions which have adopted such a rule articulate various reasons for doing so. The Massachusetts Supreme Judicial Court, in *Commonwealth v. MacNeill*, 399 Mass. 71, 77, 502 N.E.2d 938 (1987), opined:

"'This procedure reflects our assumption that an informed parent, or person standing in loco parentis, will be better able to understand the child's rights, rights which a child of such tender years is unlikely to comprehend fully without the assistance of such a person. For cases involving a juvenile who has reached the age of fourteen, there should ordinarily be a meaningful consultation with the parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent."

In *Lewis v. State*, 259 Ind. 431, 437-38, 288 N.E.2d 138 (1972), the Indiana Supreme Court reasoned:

"This State, like all the others, has recognized the fact that juveniles many times lack the capacity and responsibility to realize the full consequences of their actions. As a result of this recognition minors are unable to execute a binding contract, I.C. 1971, 29-1-18-41, Burns § 8-141, unable to convey real property, I.C. 1971, 32-1-2-2, Burns § 56-102, and unable to marry of their own free will, I.C. 1971, 31-1-1, Burns § 44-101. It would indeed be inconsistent and unjust to hold that one whom the State deems incapable of being able to marry, purchase alcoholic beverages, I.C. 1971, 7-1-1-32(10), Burns § 12-610, or even donate their own blood, I.C. 1971, 16-8-3-1, Burns § 35-4407, should be compelled to stand on the same footing as an adult when asked to waive important Fifth and Sixth Amendment rights at a time most critical to him and in an atmosphere most foreign and unfamiliar."

The Indiana court noted that the absence of a bright-line rule places the law enforcement officers in a quandary:

"There are no concrete guidelines for the authorities to follow in order to insure that the waiver will be upheld. The police are forced to speculate as to whether the law will judge this accused juvenile on the same plane as an adult in regard

to the waiver of his constitutional rights, or whether the court will take cognizance of the age of the child and apply different standards." 259 Ind. at 436.

The Missouri Court of Appeals, in *In re K.W.B.*, 500 S.W.2d 275, 281-82 (Mo. App. 1973), rejected application of the totality of the circumstances test and stated:

"Our determination that respondent has not proved a valid waiver, however, rests on a more fundamental basis. It is consistent with the protective ethic of our juvenile law that at the accusatory stage of the process a juvenile have the special benefit of parental guidance as to whether he will waive his constitutional rights to an attorney and to remain silent. . . . It would not be reasonably within the purposes of our juvenile law to extend to the child the special protection of parental presence at one critical stage of the juvenile process and withhold it at another. And since a juvenile who confesses at the accusatory stage has, in most instances, already had his trial, to deprive him at that stage of parental assistance would render meaningless the presence of the parent at the trial considered necessary for his protection by § 211.101, RSMo 1969, V.A.M.S."

In *State in Interest of Dino*, 359 So. 2d 586, 591-93 (La. 1978), the Louisiana Supreme Court found support for a bright-line rule in the reasons for making the *Miranda* warnings mandatory before interrogating an adult:

"However, exclusive use of the totality of circumstances test in relation to waivers by juveniles tends to mire the courts in a morass of speculation similar to that from which *Miranda* was designed to extricate them in adult cases. . . .

. . . .

"Similarly, the rights which a juvenile may waive before interrogation are so fundamental to our system of constitutional rule and the expedient of requiring the advice of a parent, counsel or adviser so relatively simple and well established as a safeguard against a juvenile's improvident judicial acts, that we should not pause to inquire in individual cases whether the juvenile could, on his own, understand and effectively exercise his rights. Assessments of how the 'totality of the circumstances' affected a juvenile in a particular case can never be more than speculation. Furthermore, whatever the background of the juvenile interrogated, assistance of an adult acting in his interest is indispensable to overcome the pressures of the interrogation and to insure that the juvenile knows he is free to exercise his rights at that point in time.

. . . .

"Some 'sophisticated' juveniles, without the benefit of adult advice, may understand the serious consequences flowing from a waiver of constitutional rights. However, one empirical study indicates that a large percentage of juveniles are incapable of knowingly and intelligently waiving constitutional rights. In any event,

it is the general policy of our law to protect all minors from the possible consequences of immaturity."

We find the rationale in the above cases to be persuasive. We are further persuaded by what occurred in the present case. For all intents and purposes, the State and trial court treated B.M.B. as if he were an adult or at least a much older teenager. In viewing the record, it is clear that the trial court gave only lip service to the *Young* factors and ignored whether in fact B.M.B. comprehended his rights or his situation.

We cannot ignore the immaturity and inexperience of a child under 14 years of age and the obvious disadvantage such a child has in confronting a custodial police interrogation. In such a case, we conclude that the totality of the circumstances is not sufficient to ensure that the child makes an intelligent and knowing waiver of his rights.

In Kansas, we have long recognized that under the law, a juvenile is not to be treated the same as an adult. The Juvenile Offenders Code (Code) is to be "liberally construed to the end that each juvenile coming within its provisions shall receive the care, custody, guidance, control and discipline, preferably in the juvenile's own home, as will best serve the juvenile's rehabilitation and the protection of society." K.S.A. 38-1601. Proceedings under the Code are considered civil proceedings and not criminal. The State acts as *parens patriae* for the best interests and welfare of the child. A *per se rule of exclusion as to statements made by a juvenile under* 14 years of age is consistent with the legislature's commitment to rehabilitation of the juvenile and in providing that juveniles under 14 years of age cannot be prosecuted as adults. See K.S.A. 38-1636. We do not overrule the holding in *Young* but limit its application to a juvenile 14 years of age and older.

We hold, therefore, that a juvenile under 14 years of age must be given an opportunity to consult with his or her parent, guardian, or attorney as to whether he or she will waive his or her rights to an attorney and against self-incrimination. Both the parent and juvenile shall be advised of the juvenile's right to an attorney and to remain silent. Absent such warning and consultation, a statement

or confession cannot be used against the juvenile at a subsequent hearing or trial.

Finally, the State asserts that the evidence was sufficient to adjudicate B.M.B. without consideration of his statement. Thus, it contends that the trial court's admitting B.M.B.'s statement was harmless error, if it was error. The admission or exclusion of relevant evidence in a juvenile adjudication, as in a criminal case, is governed by two rules—the harmless error rule and the federal constitutional error rule. *State v. Sanders*, 258 Kan. 409, 418, 904 P.2d 951 (1995). The voluntariness of B.M.B.'s statement is a constitutional matter. *In re Gault*, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). With regard to its review of an error of constitutional magnitude, this court has stated that it "may be held to be harmless if the appellate court can declare a belief that it was harmless beyond a reasonable doubt." *State v. High*, 260 Kan. 480, Syl. ¶ 3, 922 P.2d 430 (1996). In other words, the court must be convinced beyond a reasonable doubt that the improper admission of B.M.B.'s statement had little, if any, likelihood of having changed the result of the adjudication. To resolve that question, we must examine the evidence absent B.M.B.'s statement. The trial court expressly found that "the evidence presented is sufficient to adjudicate the respondent without consideration of statements made by the respondent during the interview addressed in the Motion to Suppress."

The standard of review on a challenge to the sufficiency of the evidence requires this court to review all the evidence, viewed in the light most favorable to the prosecution. If the court is convinced that a rational factfinder could have found the respondent guilty beyond a reasonable doubt, a challenge to the juvenile adjudication should fail. *In re J.W.S.*, 250 Kan. 65, Syl. ¶ 1, 825 P.2d 125 (1992).

B.M.B.'s counsel focuses on the issue of identification. He contends that the evidence is insufficient to convince a rational factfinder that B.M.B. was the person who caused the cut in J.'s genital area. He argues that it was not possible for B.M.B. to pull down J.'s outer pants and panties and put his finger into her genitals while J. was sitting in the sand with her legs covered by sand and while

her brother was inches away. Counsel hypothesizes that whoever tried to kiss J. earlier also put his hands in her pants.

The evidence which would identify B.M.B., while not unassailable, would seem sufficient to permit a rational factfinder to find him guilty beyond a reasonable doubt. A satisfactory answer for each of the questions raised by B.M.B.'s counsel may be found in the evidence. There was evidence that B.M.B. put his hand into J.'s pants through the waistband rather than by taking her pants off. With C. busy scooping sand into a bucket, it is conceivable that B.M.B.'s action might have gone unnoticed by the brother despite his being so close. With regard to the possibility that J. was confusing incidents and assailants, there is evidence that J. called B.M.B. a boy at times and a man at other times. Finally, the hypothesized version of events could only be a consideration if the evidence is viewed in a light *un*favorable to the State. The evidence showed that when J. screamed and reported that someone had put his finger in her "bottom," she was with her brother and B.M.B. Thus, without B.M.B.'s statement, the identification evidence, although thin, seems sufficient.

Although not argued, it is questionable that the offense of rape was shown by the evidence. B.M.B. was adjudicated of "committ[ing] acts which, if done by an adult, would have constituted . . . Rape K.S.A. 21-3502[a](2)." The statute states: "Rape is . . . sexual intercourse with a child who is under 14 years of age." K.S.A. 21-3502(a)(2). K.S.A. 21-3501(1) defines "sexual intercourse" as "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." This court has stated: "[A]ctual penetration of the vagina or rupturing of the hymen is not required; penetration of the vulva or labia is sufficient." *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994). B.M.B.'s statement, due to the lack of specificity about anatomy and actions, would have little or no bearing on this aspect of the evidence.

From J.'s testimony, nothing can be learned about where she was touched. The State relied on the testimony of the examining nurse to show indirectly that the respondent's finger or thumb penetrated J.'s vulva. In order to link the injury to tissues to

B.M.B.'s finger or thumb, the State presented evidence that J.'s injuries would not have occurred without some unaccustomed object applying force. The nurse who examined J. testified that there was sand "throughout the vaginal area and adhered to the hymen." A reasonable inference from this statement is that the hymen was intact. It would not seem reasonable to infer that the general presence of sand in the perineal area of a child who had been sitting in a pile of sand having her legs buried was of any evidentiary significance. Moreover, J. testified that B.M.B. touched her through the top of her shorts. The general presence of sand in J.'s panties certainly could be accounted for by B.M.B.'s putting his hand in the top of her shorts whether or not he touched her in a manner that would constitute "sexual intercourse" within the meaning of the statute. Whether sand could have adhered to her hymen without being pushed against it by a finger or thumb is an unasked question. With no evidence to the contrary, it may be assumed that the hymen, which is located at the vaginal opening, could have come into contact with sand without "help" from a finger or thumb. See Stedman's Medical Dictionary 736 (25th ed. 1990). It appears, then, that what may constitute the only evidence of sexual intercourse would be injured tissue within J.'s vulva. The two injuries mentioned by the nurse were a laceration and bruising that she saw with the aid of the binocular microscope. The location of the laceration is open to question on the record on appeal. The nurse used diagrams and slides to illustrate her testimony. They are not a part of the record on appeal. That the record on appeal is deficient in this regard cannot inure to the benefit of the appellant, who has the burden of furnishing a record which affirmatively shows that prejudicial error occurred. See *State v. Moncla*, 262 Kan. 58, Syl. ¶ 2, 936 P.2d 727 (1997). The testimony that seems most significant for linking injury with an area which, if touched by a finger, would constitute "penetration" is the following:

"A. Okay. And then this is, again, the stomach and the buttocks. This is—I showed you the urethral area. Again, you can see part of the laceration out here. I'm going to have to step back. If you will see in the area about ten o'clock and then over here around about one o'clock, this is around the opening of the urethra, there is [submucosal] hemorrhage all in this area."

The evidence of sexual intercourse seems thin, but not altogether missing. Whether a rational factfinder could find a respondent guilty beyond a reasonable doubt of having sexual intercourse on this evidence is questionable. Further, assuming for the purpose of this argument that B.M.B. did stick his hand in the waistband of J.'s shorts while they were playing in the sand, was a rape committed? Sexual intercourse carries with it the notion that there was some purposefulness and knowledge on the part of the perpetrator, which certainly have not been shown to be part of this case. In addition, based on this record, charging a 10-year-old boy with "statutory rape" is arguably unacceptable. In this case, the issue would not be that he was unaware that the victim was underage; instead, it would be a question whether his own youth permitted him to form the necessary intent.

We do not find the admission of B.M.B.'s statement to be harmless. We are not convinced that, absent the statement, a rational factfinder could find beyond a reasonable doubt that B.M.B. raped J.

The adjudication by the district court is reversed.

McFARLAND, C.J., and SIX, J., concur in the result.