NOT DESIGNATED FOR PUBLICATION

No. 125,551

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF N.W.

MEMORANDUM OPINION

Appeal from Atchison District Court; MARTIN J. ASHER, judge. Submitted without oral argument. Opinion filed February 2, 2024. Affirmed.

*John R. Kurth*, of Kurth Law Office Inc., P.A., of Atchison, for appellant.

*Sherri L. Becker*, county attorney, for appellee.

Before HILL, P.J., HURST, J., and LAHEY, S.J.

PER CURIAM: After a jury trial, N.W. was convicted of seven counts of aggravated indecent liberties with a child for his actions toward two minors in 2019 and 2020 while he himself was also a minor. N.W. attacks his convictions on multiple grounds, including the sufficiency of the evidence, but this court finds none of those claims meritorious. There was sufficient evidence to support N.W.'s convictions, and the district court did not err certifying the challenged expert witnesses nor did the court's evidentiary rulings inhibit N.W.'s defense. Accordingly, the district court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Among his many claims, N.W. challenges the sufficiency of the evidence supporting his convictions which requires this court to evaluate the specific facts supporting his convictions. The State charged N.W. with eight counts of aggravated indecent liberties

1

with a child under 14 years of age for actions allegedly committed against S.S. (born in 2010) and L.C. (born in 2011). N.W. (born in 2004) was a minor at the time of the alleged actions in 2019 and 2020. After a six-day trial in March 2022, the jury convicted N.W. of seven of the eight counts of aggravated indecent liberties with a child under 14 related to the following charges:

- Count 1: As to S.S. between May 1, 2019, and February 25, 2020;
- Count 2: As to S.S. on February 11, 2020;
- Count 3: As to L.C., in a car, between March 1, 2019, and March 19, 2020;
- Count 5: As to L.C., in a bush, between March 1, 2019, and March 19, 2020;
- Count 6: As to L.C., in N.W.'s home, between March 1, 2019, and March 19, 2020;
- Count 7: As to L.C., in N.W.'s home, between March 1, 2019, and March 19, 2020; and
- Count 8: As to L.C., in N.W.'s home, between March 1, 2019, and March 19, 2020.

*Neighborhood Children and Hide-and-Go-Seek*

The victims, S.S. and L.C., along with several other minors who will not be named, testified during the trial. S.S.'s family moved to N.W.'s neighborhood in the summer of 2018 and knew N.W. and L.C.'s families through extracurricular programs. After their move, S.S. became friends and played often with nearby children—including N.W. S.S.'s mother testified that S.S. and N.W. became "awful close" and she described the relationship as that of a "big brother." S.S.'s mother testified she called N.W. her son and N.W.'s mother called S.S. her daughter.

L.C.'s mother testified that N.W. would message her through Facebook to ask if L.C. could play. One of L.C.'s older sisters testified that she and N.W. were in the same grade and had dated on and off. She explained that S.S. and N.W. were inseparable until spring break of 2020 when N.W. started saying that S.S. was a brat, selfish, and rotten, which was a sudden change because before that they had been "buddy, buddy."

The neighborhood kids would sometimes play hide-and-go-seek, and S.S. testified the games would go on for hours—sometimes "from noon to dark." S.S. recalled that N.W. and another boy would pick the teams. Two of N.W.'s friends testified or confirmed that they would play hide-and-go-seek with their siblings and other neighborhood kids, and an older child was usually paired with a younger child for the game. N.W.'s friends testified that N.W. would normally pair up with S.S. or L.C. L.C. testified that she would usually hide with N.W. or by herself if N.W. was with S.S. One of S.S.'s best friends, who also played the game, confirmed that N.W. and S.S. would be on the same team and when she tried to team up with S.S., "[N.W.] wouldn't want me to."

N.W.'s mother testified that N.W. would contact S.S.'s mother to see if S.S. could play when his younger cousin was visiting because N.W.'s mother wanted his younger cousin to have friends his age. By 2018, N.W.'s mother testified N.W. had mostly stopped playing hide-and-go-seek with the neighborhood kids and that he played "[m]aybe 5 times" in 2018. N.W. confirmed that he played hide-and-go-seek in 2016 and 2017 but denied playing very much by 2018 unless his cousins were there. In 2018 and 2019, N.W. testified that when he did play hide-and-go-seek, he would team up with his friend from school or the kids would randomly select partners. On cross-examination, N.W. confirmed that in 2019 to 2020, his cousin visited, and they played with the younger kids in the neighborhood more than 10 times, though they did not necessarily play hide-and-go-seek each time.

*S.S.'s Initial Disclosures*

S.S.'s mother testified that in 2019, when S.S. was in third grade, her behavior changed. She did not want to go outside to play, would claim her stomach hurt or she was tired, and would stay in bed on her phone or tablet unless her mother made her go outside. During that same time, S.S. would get pains that "would stop [S.S.] in her tracks because her vagina was hurting." S.S. "would complain that her vagina was burning and that it was hurting," but her mother was not concerned because the pain was brief and even though her vagina was a little red, her mom thought S.S. might not have been cleaning herself properly. Her mother also explained that S.S. "did not always want to wear underwear" and denied that anyone had touched her vagina.

S.S. told her friend that "[N.W.] was touching me" on her vagina and breasts, and that he was kissing her. S.S. testified that her friend advised her to tell her mother which S.S. did the next day. The friend confirmed that S.S. told her N.W. had been touching her "private area" but denied having advised S.S. to tell her mom about it; rather, she recalled just hugging S.S. S.S. confirmed that prior to disclosing, her mother had asked her twice if anyone was touching her which S.S. denied. S.S. explained that "I didn't want [N.W.] to be mad at me," "didn't want to like ruin the neighborhood or anything," and she confirmed that she did not want N.W. to get into trouble.

S.S.'s mother testified that in late February 2020, S.S. told her mother "I need to tell you all my secrets," and she then "told me about the kissing." S.S.'s mother testified that S.S. told her "that [N.W.] makes her kiss him. And that one time he had stuck his tongue in her mouth and she had bit it." She also testified that S.S. disclosed that they would lick each other's faces. Contrary to her mother's recollection, S.S. testified that she told her mother about the kissing while they were at McDonald's the following day.

4

The next day, S.S.'s mother testified that she picked up S.S. from school and they were driving when she asked S.S. if anything else had happened with N.W. She recalled that, at first, S.S. said no. However, while they were in the McDonald's drive-through, S.S. took her mother's chin, pushed her head away and told her, "don't look at me while I tell you the rest." S.S. said she asked her mom to look away because "it's embarrassing." S.S.'s mother testified that she found a place to park and then S.S. "proceed[ed] to tell me that he had touched her chest area. And he had put his hand down her pants and touched her vagina and her butt." S.S. confirmed that she told her mother about N.W. touching her vagina and breasts. While S.S. spoke, she was "just real matter of fact about it," and afterward S.S. commented "that she just felt so much better now that she had told me about what had happened." S.S.'s mother also testified that S.S. "was worried that it was happening to [L.C.] also."

S.S.'s mother asked follow-up questions about whether anyone else had touched her inappropriately, whether N.W. touched her under or over her clothes, and when the last incident occurred. S.S. responded that only N.W. touched her, that it was under her clothes, and the last time it happened was on February 11, 2020. S.S.'s mother explained that, as a forensic interviewer, she knew not to ask more questions.

On February 28, 2020, the day after S.S.'s second disclosure, S.S.'s mother took her to the local police station where they set up a forensic interview in a different county. S.S.'s mother denied giving S.S. any tips or practicing the interview with her. A video of the interview was played for the jury but was not provided in the record on appeal. Captain Eichelberger, who investigated this case and had watched the interview from another room, testified that S.S. was consistent in her statements and gave specific information about the location of events. Captain Eichelberger testified that S.S. said she did not report the touching earlier because "[s]he was worried about [N.W.] because they were friends. . . . She was told that if she were to tell and talk about this, that they wouldn't be able to do what they were doing anymore. She was told that she would be

5

called a snitch. Things of that nature." The detective also testified that S.S. eventually disclosed because she felt N.W was doing this to another girl and her uncle had recently passed away, so she "wanted to tell her mother all her secrets." He denied that S.S. disclosed anyone other than N.W. touching her.

S.S.'s mother testified that after the forensic interview, she brought S.S. for a physical examination at Children's Mercy Hospital (CMH). A child abuse pediatric fellow at CMH testified she examined S.S. on March 19, 2020, and she was aware that there were "concerns for digital to anogenital contact" and "digital to breast contact." The physician testified that S.S.'s mother said S.S. had been more anxious and withdrawn than usual, had been having aggressive behaviors at school, and that in the summer of 2019, S.S. had vaginal discharge, redness, and irritation. Because the last contact was more than a month before the examination, the doctor explained that she "had anticipated that there was a low likelihood that there would be physical examination findings." She testified that S.S. had "some redness to her vaginal vestibule" but her anogenital examination yielded nonspecific findings. The doctor explained that with "genital injuries in the context of child sexual abuse over 90 percent of cases where a child does disclose sexual abuse, the anogenital examination is normal." She diagnosed S.S. with "child sexual abuse" and confirmed this was based on S.S.'s disclosure and that it was standard practice.

S.S.'s mother testified that after the disclosure, S.S.'s behavior "…was a little better. But [S.S] would still have those anger outbursts that would come and she was still asking a lot of questions about why did he do this? Why did it happen?" S.S.'s mother also explained that S.S. had been "pinching herself. Or digging her nails in while she'd leave marks on her arms" and that this occurred when S.S. was in second and third grade. The anger and self-harm had resolved since S.S. completed trauma therapy. S.S.'s mother testified that after the disclosure, S.S. "was still having trouble sometimes with washing down there. She said it made her feel gross and she just didn't like touching down there."

Her mother asked what N.W.'s hand did; S.S.'s mother reenacted S.S.'s movement to the court and confirmed that S.S. had spread her middle and pointer finger apart into a V and then used her other pointer finger to slide in between the V.

S.S.'s mother testified that N.W. "used to run around the neighborhood, yelling snitches get stitches." S.S. testified that N.W. "told me that if I would tell mom, that we wouldn't be friends anymore." She stated that she wanted to be his friend and "didn't want to mess with the neighborhood." She thought that "if I broke up friendship with [N.W.], cause he was like, him and [N.W.'s friend] were like the main part of the neighborhood and if I broke off friends with [N.W.], then I knew that like everything would just scatter. And no one would be friends." S.S. testified that she was done "[c]ause it had been going on for two years and I was done. I didn't want to do it anymore."

On cross-examination, S.S.'s mother testified that S.S. finally disclosed because she thought "that something was happening to [L.C.]." S.S. confirmed that after she told N.W. she wanted to stop, she thought N.W. might have started touching L.C. This was "[b]ecause the next time that we played hide-and-go-seek, he would always pick me, but that time he didn't pick me. He picked [L.C.] instead. And then he just kept on picking [L.C.], and picking [L.C.], and picking [L.C.]." S.S. denied seeing anything happen with N.W. and L.C. or that L.C. told her N.W. had done anything. S.S.'s mother testified that she notified police about potential abuse to L.C. as soon as S.S. expressed her concern.

*L.C.'s Disclosures and Testimony*

Captain Eichelberger confirmed that on March 16, 2020, he told L.C.'s family about the investigation. L.C.'s mother testified that Captain Eichelberger contacted her and said that L.C.'s name had been brought up in an ongoing investigation because another child was worried L.C. was being molested. The officer did not mention S.S. until L.C.'s mother asked if the child who reported the concern was S.S. She testified that

7

when the detective mentioned the allegations were against N.W., "dominoes clicked into place" and it made sense. She told Detective Eichelberger that about two days prior, L.C. had asked if it was inappropriate for N.W. to want her to go into his house when his mother was not home. Captain Eichelberger testified that he asked L.C.'s mother to ask L.C. open-ended questions about N.W. and to stop the conversation and contact him if L.C. made any disclosures.

L.C.'s mother testified she told L.C. the police had come to the house because her name came up in an investigation, they thought L.C. might be getting molested, and "I just need to know from you, if this is true or not." L.C. told her mother it was true and then, L.C.'s mother testified, L.C. had "word vomit;" she was worried she was in trouble and kept apologizing for not telling her mother. L.C.'s mother reassured her that she was not in trouble and told L.C., "if you want to, can you tell me who it is?" and L.C. said it was N.W. L.C. asked her mother if S.S. was the person who told. L.C.'s mother denied having mentioned S.S.'s or N.W.'s name during this conversation with L.C. L.C. denied having talked to S.S. about the touching before telling her mother.

L.C.'s mother testified that L.C. said it started when N.W. and her would hide in the back seat of a car. He would say that his hands were cold and he would warm them up on L.C.'s belly. "[T]hen one day, he stuck his hands down the front of her panties and started flicking her." L.C. also told her mother that there was a time he spit on his hands because she was "too dry" and then he would put his hand back in her pants and rub her. L.C.'s mother then told L.C. that she needed L.C. to stop because she needed to call the police. L.C.'s mother testified that she called Detective Eichelberger back and told him that L.C. had confirmed the abuse, but the detective testified he first received notice from the local guidance center and then from L.C.'s mother. L.C.'s mother testified that after the disclosure, L.C.'s emotions were a rollercoaster where one minute she would cry and apologize for not saying anything and the next she was afraid of getting N.W. in trouble.

A forensic interviewer testified that she interviewed L.C. on April 10, 2020. Although the video of the first interview was played for the jury, it was not provided on appeal. The forensic interviewer testified that L.C. said N.W. had been touching her for a little over a year. She said N.W. was squeezing and rubbing her nipples, that he rubbed her butt, that he rubbed and put his hands in her vagina, and that he put his hand between her butt crack. The forensic interviewer testified that L.C. said that the incidents happened in a car, in a backyard between a fence and tree line, and inside of N.W.'s home while hiding. Captain Eichelberger confirmed that he attended L.C.'s first forensic interview and L.C. discussed how N.W. began picking her as a teammate instead of S.S., that L.C. "described the same occurrences happening to her that had previously happened to [S.S.]," that she "described the same behavior" and the "same type of hiding spots." The detective noted that "she was also very detailed in explaining the things that were happening to her physically."

A pediatrician at CMH testified she examined L.C. on May 1, 2020. Prior to the examination, she knew L.C. had disclosed that N.W. touched her breasts, vagina, and butt with his hand or finger. The pediatrician testified that the examination was normal, as she expected. She explained that the vaginal and anal region can heal within several days, and she confirmed that a normal exam does not conflict with a disclosure of sexual assault. The pediatrician diagnosed L.C. with child sexual abuse.

Captain Eichelberger confirmed that he spoke to L.C.'s mother again in August 2020. He testified that L.C.'s mother said, "that it started with [N.W.] putting his hands on her stomach because he was cold." Then, L.C. told her that he would touch her hair at random and "he had put his hands down her pants a few times." When N.W. put his hands down her pants, "she stated that sometimes it would go inside of her. She described this as flicking" when talking to her mother. Then, "at one point during the flicking conversation, I believe she stated to her mother that one time he took it out. Spit on his finger and put it back in."

9

L.C.'s mother testified that after the initial disclosure, she told L.C. not to tell her details of what happened because she wanted L.C. to describe events in her own words and to avoid allegations that L.C. was parroting her mother. However, at Thanksgiving 2021, L.C. was upset and when her mother asked why L.C. said she was sorry she had not warned S.S. about N.W. when S.S. first moved into the neighborhood. L.C. then said, "but I was glad he was leaving me alone," and that is when her mother realized that N.W. had started with L.C.

A different forensic interviewer conducted L.C.'s second interview in January 2022, and a video of the interview was played for the jury but not provided on appeal. According to the interviewer's testimony, the interview focused on L.C.'s allegations that N.W. touched her at his house and her statements that implied N.W. abused her before he abused S.S.

L.C.'s mother testified that she noticed in late 2016 that L.C. began wetting the bed "a lot" though she had been potty trained for some time. She kept getting UTIs, cried all the time, and was not the same. L.C.'s sister testified that in 2018 or 2019, L.C. began to wet the bed again and did not want to go outside to play. L.C.'s father testified that shortly after disclosing the alleged abuse, L.C. stopped wetting the bed and was also a little bit calmer but that she did wet the bed a few more times in the weeks leading up to trial.

*Specific Allegations*

At trial, S.S. testified that "[w]hen I was hiding with [N.W.] he would touch my vagina and my boobs" and that this happened "every time" they hid together. She said that she was either nine or ten years old when this occurred and that N.W. was 15 years old. S.S. also testified that she remembered facing N.W. and they would kiss; he would put his tongue in her mouth and his hands would be in her pants. The forensic interviewer

10

confirmed that S.S. told her N.W. made her open her mouth and stuck his tongue in her mouth and that his hands were in her pants when that happened. S.S. denied remembering the first time N.W. touched her but later recalled the most recent event.

At trial, L.C. testified that when she was around nine years old, she played hide-and-go-seek with the neighborhood kids, and N.W. would touch her chest, butt, and vagina with his hand while moving them under her clothes. L.C. explained that N.W. touched her a lot—more than once or twice—that it was mostly during hide-and-go-seek, but she denied remembering the first occurrence. L.C. then demonstrated the act by gesturing with her hand, moving it back and forth across her chest. When he touched her vagina, L.C. testified that he would move his hand around and that it made her body feel weird. When he touched her butt, L.C. testified that his hand was still.

N.W. testified that he was 15 years old when these allegations arose and denied touching L.C. or S.S. inappropriately. He explained that his mother was molested as a child and that he would not do that.

*Count I – Allegations by S.S. During Hide-and-Seek*

S.S. testified that N.W. touched her while they hid in a spot under a friend's shed where there were stairs going down, a lot of leaves, and was really dark. She stated that there was "like this narrow spot. It was like two walls and then a wall behind and it would just go down and so like, just a little bit of sunlight was coming in." L.C.'s older sister described an area near that friend's porch that was consistent with L.C.'s description where kids would go downstairs and could turn toward a door that would go inside. The hide-and-go-seek seeker would have to go down the stairs to see if anyone was hiding there, and L.C.'s sister confirmed that if the seeker found someone there, the person hiding would be unable to escape. N.W. testified that he only hid in that space when he was hiding with the friend who lived at that house.

11

S.S. testified that in this shed-type hiding space, she and N.W. sat on the ground with her sitting between N.W.'s legs facing him, and N.W. would "slowly slide his hands down" into her pants so that he was touching her vagina. S.S. then made a hand gesture and confirmed the prosecutor's explanation for the record that "you indicated with your pointer finger and your middle finger that they were together and then it spread them apart like a V. . . And then you used your other hand and your pointer finger and made a motion in between." S.S. testified that "it went on for a while and then [another friend] came, but he didn't see it because [N.W.] would fastly pull his hand out." She also confirmed that they kissed while in that location and position.

S.S. testified that N.W. touched her vagina on her back patio at night. She remembered this event because "it hurt when he touched me" and "when the ones that hurt were when I remembered it." They were playing hide-and-go-seek and the patio was used as the "base." Contrarily, L.C.'s older sister testified that when she played, the garage door at her house was used as the "base." S.S. recalled sitting on a "couch thing with like two chairs together" on N.W.'s lap facing away from him and testified that N.W. slowly put his hand in her pants and touched her vagina and she was "pretty sure it was more than one finger." She testified that N.W. stopped when another one of the kids "found [L.C. and her brother] and they came running."

S.S. testified that N.W. would touch her in a green car that was parked in his backyard. She would be on his lap facing away from him in the driver's seat. N.W. would then "slide his hands into my pants and touch my vagina" and it made S.S. feel "bad." She explained that N.W. would touch her "in the front part and a little bit in the middle." He would "go like in between" and "spread it apart and go like that." S.S. also testified that N.W. would put his hands under her clothes and touch her breasts while sitting in the car, and "sometimes he would like squeeze them. But that's it." She explained that N.W. would stop when anyone found them or they could hear the others coming.

12

*Count II – Allegations by S.S. on February 11, 2020, at N.W.'s House*

On February 11, 2020, S.S. and another friend were inside N.W.'s house watching videos or Nickelodeon. S.S. testified that she, N.W., and another friend were in N.W.'s bedroom watching videos or television with the friend by the wall, S.S. in the middle, and N.W. on the edge. S.S. testified that she was "pretty sure" they were all underneath a blanket because it was cold outside but could not recall for sure. N.W. confirmed that he, S.S., and the friend did watch videos in his bed but stated that they were all above the covers. The friend recalled watching Grand Theft Auto videos and testified that they were all above the covers.

S.S. testified that N.W. pulled her close to him and slid his hands into her pants to touch her vagina. She denied that he said anything to her. When the other friend got up to go to the bathroom, she told N.W. "I don't want to do it anymore. And I'm done. And then [N.W.] stopped touching me." S.S. testified that after N.W. stopped touching her, she got on top of the covers and Logan came back into the room. S.S. confirmed that N.W. never touched her again after this incident. S.S.'s mother testified to what S.S. disclosed to her regarding this incident, and it was consistent with S.S.'s testimony.

*Count III – Allegations by L.C. in a Car*

One of the forensic interviewers testified that L.C. told her that when she and N.W. hid in his brother's car, L.C. was between his legs with the seat laid back, and he touched her butt. Captain Eichelberger had attended that interview and testified that L.C. said N.W. touched her in a silver car with black tires. At trial, L.C. also confirmed that she and N.W. would hide in a silver car, and she testified that they hid in it three times. However, at trial L.C. denied that N.W. touched her in that car.

13

At trial, N.W.'s father confirmed that his family had a silver Cadillac in Summer of 2019 and that N.W.'s brother owned a white Impala. One of the brother's friends testified that the white Impala was "like a light tan" because it was white but dirty. Regarding the white Impala, N.W.'s father testified that the seats did not recline at all and were stationary. Further, N.W.'s father, mother, brother, and brother's friends all testified that the Impala and Cadillac were always locked. N.W.'s mother testified that they also owned a blue Mountaineer from December 2018 through August 2019, but that it was always locked.

N.W.'s cousin recalled that kids hid in a car at N.W.'s house once. Another kid also testified that there was a black car in N.W.'s yard "that was always unlocked and people would hide in the back - - backseat or the trunk." L.C.'s sister also testified that the kids, especially N.W., would hide inside of vehicles parked at his house. When she was seeker, she would look in N.W.'s cars if she could not find the others anywhere else.

*Count V – Allegations by L.C. Between a Bush and Fence*

The forensic interviewer testified that L.C. said the last time N.W. touched her was three to four months before the interview, that it happened when they were playing hide-and-go-seek at night, that they were hiding between a fence and bush, and that he touched her vagina. She confirmed that this was the only event L.C. said happened at night. In her second interview, a different forensic interviewer testified that L.C. said when they were in the bush, she was in front of N.W. with her back to his chest in the position you would go down a slide.

At trial, L.C. denied that anything happened in a bush, though it is unclear if she and the prosecutor meant the same bush, as there were multiple bushes the children used for hiding. She also denied that N.W. ever touched her when they played at night.

14

*Count VI-VIII – Allegations by L.C. in N.W.'s House on a Stool*

Captain Eichelberger testified that in her forensic interview, L.C. talked about being in N.W.'s living room on a black stool where she would sit on N.W.'s lap or between his legs and that N.W. would touch her "down there" and also touched her butt and chest. The forensic interviewer testified that L.C. described the black stool being by the front door while they were hiding, and that sometimes N.W.'s brother or cousin were in the house when it happened. L.C. said that N.W. would touch all of her "bad parts" while she sat on his lap, which included her vagina, butt, and nipples. L.C. remembered that N.W. touched her while on the stool four times.

In her second forensic interview, L.C. said that the black seat was a chair or square that did not have a back and was against "the cylinder and the brick would support your back." L.C. also said the stool was inside the door and by some windows. L.C. told the second forensic interviewer that when N.W. touched her on the stool, he would sometimes hold one arm across her and have one hand in her pants.

At trial, L.C. recalled that N.W. would have her sit on his lap facing away from him while on "a little square" in his house that was black without a back on it. She said the black chair was positioned so that you had to look behind you to see the door. There was another place "with the desk with a whole bunch of chairs," but L.C. did not know how to describe it. She said that N.W. would then start touching her under her clothes on her "privates" which meant her chest, butt, and vagina. L.C. denied that she or N.W. said anything while this happened but recalled that one time she tried to get up but N.W. grabbed her arm and said, "[N]o, come sit back down." She explained that he would stop right before someone caught them and confirmed that no one saw him touch her. Contrary to her statements during one of her forensic interviews, at trial L.C. confirmed that no one was home when N.W. would touch her on the black chair, and that it occurred during the daytime.

15

N.W.'s brother denied that there was any kind of black, square piece of furniture or a desk in his house. N.W.'s mother denied having a small, square, black stool or chair without a back on it in her home and denied having a desk anywhere in the house. When confronted with a picture of a black stool in her basement, she explained that it was from 2013 and she did not have it anymore.

*Verdict and Sentence*

On March 15, 2022, the jury found N.W. guilty of seven counts of aggravated indecent liberties with a child, which included two counts involving S.S. and five involving L.C. The jury found N.W. not guilty of one of the counts involving L.C. in a vehicle. The court sentenced N.W. to serve 24 months in a juvenile correctional facility with 6 months of probation following release. N.W. appealed.

DISCUSSION

N.W. appeals his convictions asserting that (1) there was insufficient evidence to sustain his convictions; (2) the district court erred in certifying the State's experts; (3) the district court erred in denying N.W.'s ability to present a particular defense; and (4) cumulative error deprived N.W. of a fair trial. Despite N.W.'s numerous claims of trial errors, this court finds no reversible error.

I. THERE IS SUFFICIENT EVIDENCE TO CONVICT N.W. OF EACH COUNT OF AGGRAVATED INDECENT LIBERTIES WITH A CHILD

N.W. was convicted of seven counts of aggravated indecent liberties with a child which is defined as:

16

"(b) Aggravated indecent liberties with a child is:

. . .

"(3) engaging in any of the following acts with a child who is under 14 years of age:

"(A) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." K.S.A. 2019 Supp. 21-5506(b)(3)(A).

In evaluating the sufficiency of the evidence, this court reviews the evidence in the most favorable light to the prosecution and "[i]f the court is convinced that a rational [fact-finder] could have found the respondent guilty beyond a reasonable doubt, a challenge to the juvenile adjudication should fail." *In re B.M.B.*, 264 Kan. 417, 433, 955 P.2d 1302 (1998). The appellate court does not reweigh evidence, resolve conflicting evidence, or pass judgment on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). "This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

*Evidence Supporting Count I – Allegations by S.S. During Hide-and-Go-Seek*

The Jury found N.W. guilty of Count I for touching S.S. while they played hide-and-go-seek at times between May 1, 2019, and February 25, 2020. N.W. argues that S.S.'s allegation that he touched her in a green car was unsupported because N.W. denied touching her, the family did not own a green car, and the blue car was always locked and was not used for hide-and-go-seek. N.W. also argues that S.S.'s allegation that he touched her in the dark space under one of the kids' porch or house was unsupported because it was "not a good hiding place." Similarly, N.W. argues that S.S.'s allegations that he touched her on the patio were unsupported because it was plainly visible and not a good hiding space.

17

However, contrary to N.W.'s arguments, there was sufficient evidence supporting each incident. Multiple children testified that a car was used as a hiding place, and S.S.'s testimony was detailed and consistent with her prior statements to interviewers. Additionally, multiple children—including N.W.—testified that there was a hiding place under the neighbor's house, and S.S. provided detailed testimony about the space and touching. Finally, S.S. testified they were on the patio because it was base during hide-and-go-seek, not because they were hiding.

Although N.W. denies the incidents, S.S. provided specific, detailed testimony consistent with her prior statements to interviewers. N.W. mistakes controverted evidence for insufficiency. There was sufficient evidence for a rational fact-finder to find N.W. guilty of aggravated indecent liberties with a child as charged in Count I as to S.S.

*Evidence Supporting Count II – Allegations by S.S. on February 11, 2020, at N.W.'s House*

The jury found N.W. guilty of Count II for inappropriately touching S.S. on February 11, 2020, while they watched television in N.W.'s room. N.W. denied touching S.S. as alleged and contends that the other kid present did not witness him touch S.S. and their testimony partially contradicted S.S.'s testimony. While all the kids recalled being in the bedroom and watching the television, they disagreed on the content of the television programing and whether N.W. and S.S. were above or below the covers. Although some testimony contradicted the circumstances of S.S.'s allegations, the jury apparently found S.S.'s testimony more credible than any contrary testimony, including N.W.'s denial. This court does not reweigh witness credibility. Just because the evidence was controverted does not mean it was insufficient. See *State v. Rucker*, 309 Kan. 1090, 1095, 441 P.3d 1053 (2019) (evidence was sufficient to support jury's conviction of defendant despite conflicting witness testimony). A jury is permitted to believe one witness more than another, and when this court reviews the evidence favoring the State, a rational fact-

18

finder could find N.W. guilty beyond a reasonable doubt of touching S.S. as she described on February 11, 2020, while they watched television.

*Evidence Supporting Count III and V – Allegations by L.C. in a Car and Between a Bush and Fence*

N.W. argues there was insufficient evidence to convict him of touching L.C. in a car or in a bush because L.C. testified that N.W. touched her "every single time" in his house and there was no evidence of acts that occurred in the bush or car. However, during L.C.'s forensic interviews, which were presented to the jury, she said that N.W. inappropriately touched her when they hid in the bush and detailed how they were positioned as though going down a slide. During her forensic interviews, L.C. also described N.W. inappropriately touching her while they hid in the car, including how they were positioned, where he touched her, and what the car looked like. However, at trial, L.C. confirmed that she and N.W. hid in a car but denied that N.W. inappropriately touched her while they were inside. So, part of her trial testimony contradicted her prior forensic interview description. The jury apparently found L.C.'s forensic interview testimony credible as it found N.W. guilty of one count of touching her in the car but not the second count of touching her in the car. This demonstrates that the jury addressed and resolved the discrepancies in L.C.'s testimony and forensic interview.

Once again, this court cannot resolve the conflict in evidence or make credibility determinations about why that contradiction might have occurred. There was sufficient evidence upon which a rational fact-finder could find N.W. inappropriately touched L.C. in violation of the aggravated indecent liberties with a child statute when they hid in a bush and in the car.

19

*Evidence Supporting Count VI-VIII – Allegations by L.C. in N.W.'s House on a Stool*

N.W. argues there was insufficient evidence to convict him of three counts of touching L.C. in his house because her testimony was uncorroborated and his family did not own a black chair like the one L.C. described. L.C. told one of the forensic interviewers that N.W. inappropriately touched her on at least four different occasions on a black stool or chair in his house. L.C. testified to details about N.W.'s house—the black chair or stool—and how N.W. touched her on the chair. N.W. and his family denied having such a chair and there was no evidence other than L.C.'s testimony that such a chair or stool existed. So, there was conflicting evidence at trial about the existence of the chair, but this court cannot resolve that conflict. It is the fact-finder's responsibility to resolve such a conflict and on appeal there was sufficient evidence when viewed in favor of the prosecution from which a rational fact-finder could find N.W. guilty of aggravated indecent liberties against L.C. on three occasions at his home.

*Evidence Supporting N.W.'s Intent*

N.W. claims that the State failed to present evidence that he had the requisite intent to violate the statute. To support his convictions, the State was required to show that N.W. committed the lewd touching of S.S. and L.C. "with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." K.S.A. 2019 Supp. 21-5506(b)(3)(A). "Actual arousal or satisfaction of the sexual desires of either [the victim or defendant] is not necessary for the existence of the crime." *State v. Brown*, 295 Kan. 181, 201, 284 P.3d 977 (2012). The State can prove specific intent, including sexual intent, with circumstantial evidence. *State v. Reed*, 300 Kan. 494, 502, 332 P.3d 172 (2014).

Here, S.S. and L.C. alleged that N.W. repeatedly and secretly touched them on their vaginas, butts, and breasts. This was not an isolated incident, and there is no

20

evidence of inadvertent, unintentional, medical, hygienic, or other reason for N.W.'s repeated touching of L.C. and S.S.'s sexual organs. Moreover, N.W. did not "touch" the victims by laying hands on them or brushing across their sex organs; he manipulated them, opened them, and rubbed their sex organs. Further, S.S told her mother that N.W. made her kiss him and she testified he had his hands in her pants at this time. The locations where N.W. touched the victims' bodies, the type of touching—which included rubbing and insertion into sex organs—the quantity of touches, the secretiveness associated with the touching, and the French kissing that occurred in conjunction with the touching overwhelmingly demonstrates N.W.'s intent to arouse or satisfy sexual desire. See e.g., *State v. Clark*, 11 Kan. App. 2d 586, 593, 730 P.2d 1104 (1986) ("The location of the touching has no other logical explanation except that the touching was to satisfy the defendant's sexual desires."); *State v. Stout*, 34 Kan. App. 2d 83, 88, 114 P.3d 989 (2005) (recognizing French kissing as a form of intimate contact). Additionally, there was no innocent, nonsexual explanation for the touching. Intent can be shown through circumstantial evidence and inference. *Reed*, 300 Kan. at 502 ("[I]t is well established that the State can prove specific intent, which in this case includes sexual intent, with circumstantial evidence."). There was overwhelming and sufficient evidence for a rational fact-finder to find N.W. possessed the requisite intent to commit aggravated indecent liberties with a child in each of his convictions.

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING TWO EXPERT WITNESSES

N.W. asserts that the district court erred in certifying two of the State's witnesses as experts and their testimony unfairly bolstered S.S.'s and L.C.'s credibility which deprived him of a fair trial. The admission or exclusion of an expert's testimony generally lies within the sound discretion of the district court. *State v. Edwards*, 299 Kan. 1008, 1015, 327 P.3d 469 (2014). A court abuses this discretion if its decision to admit or omit expert testimony is based on an error of law, error of fact, or is so arbitrary that no

21

reasonable jurist would agree. As the party alleging error, N.W. carries the burden to demonstrate that the district court's decision to certify the experts was an abuse of its discretion. *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

On September 20, 2021, the parties entered into a reciprocal discovery agreement which provided that:

> "1. The State and Defendant agree that both parties will comply fully with the Discovery obligations set forth in K.S.A. 22-3212 and the applicable Kansas case law.
> "2. The State further agrees that it has provided the Defendant copies of police reports and other related material within the County Attorney's file, pursuant to its 'open-file' policy.
> "3. In consideration of the above, the Defendant agrees to provide the State with a written list, at least ten (10) business days prior to jury trial, of prospective witnesses intended to be called by the Defendant in jury trial. . . . *In the case of an expert witness, Defendant agrees to provide the name of the expert, and any reports authored by the expert for use at trial 30 calendar days prior to trial."* (Emphasis added.)

The next month, when the parties met to discuss rescheduling the trial, the prosecutor explained that the pediatrician who examined L.C. was unavailable for the proposed date and stated, "she's one of my fact expert witnesses." At another pretrial hearing on March 3, 2022, the prosecutor explained the State intended to call "16 witnesses" which included "[t]hree forensic interviewers. Two . . . experts from Children's Mercy, plus the lay witnesses."

During trial, on March 10, 2022, the State asked to certify the two CMH physicians who examined S.S. and L.C. as expert witnesses. N.W. objected, arguing that the State failed to disclose that these witnesses would be experts. After confirming that the State had provided N.W. with the doctors' reports during discovery, the district court overruled N.W.'s objections.

N.W. claims that the State failed to follow the reciprocal discovery agreement and designate the doctors as expert witnesses. Although N.W. did not explain how the State failed to follow the reciprocal discovery agreement, it appears that N.W. believes the State's failure to submit a written notice of the expert witness designation violated the agreement. However, the reciprocal discovery agreement did not require the State to make such a written submission.

Moreover, expert witness disclosures in criminal cases are governed by statute, which requires that:

> "The prosecuting attorney shall also provide a summary or written report of what any expert witness intends to testify to on direct examination, including the witness' qualifications and the witness' opinions, at a reasonable time prior to trial by agreement of the parties or by order of the court." K.S.A. 2022 Supp. 22-3212(b)(2).

While this statute requires the prosecutor to provide "a summary or written report" of what an expert will testify to—unlike the expert witness requirements in civil cases —it does not require the prosecutor to provide written notice of the intent to designate a witness as an expert. Compare K.S.A. 2022 Supp. 60-226(b)(6)(E); see *Edwards*, 299 Kan. at 1017 (holding that "the civil discovery rules of K.S.A. 60-226 relating to expert witnesses do not apply in criminal proceedings.").

While there may be an argument that the same standards for expert witness disclosures that exist in civil cases should apply to criminal cases, the Legislature has set forth different and far less strenuous disclosure requirements in criminal proceedings. Prior to trial, the State provided the names of all the witnesses it intended to call, the reports the physicians would rely upon as experts, and orally disclosed that the physicians would be called as experts. While it would undoubtedly avoid confusion and surprise for the parties in criminal cases to file notice of intent to designate a witness as an expert—as

is required in civil cases—there is no statutory requirement in criminal cases. The statute, reciprocal discovery agreement, and case law clearly establish that the State was not required to do more than it did here where it provided oral notice of its intent to call the physicians as experts, and provided the defense with a copy of the reports the witnesses would rely upon. There is also no allegation that the prosecutor failed to provide the expert's credentials. The district court's decision to certify the physicians as expert witnesses was not arbitrary or based on an error of law or fact and thus was not an abuse of discretion.

III.     THE DISTRICT COURT DID NOT PREVENT N.W. FROM PRESENTING HIS THEORY OF DEFENSE

N.W. claims the district court erred by not allowing him to present his defense because he was not allowed to (1) inquire about possible prior allegations of abuse the girls may have made; (2) inquire about L.C.'s mother failing to properly supervise her children; or (3) ask about services L.C. and her sibling received through the guidance center. Although N.W. makes these broad allegations, he fails to argue that the evidence he wanted to present was material and relevant. Although a point raised incidentally in a brief and not argued is deemed waived or abandoned, this court will address the allegations for completeness. See *Meggerson*, 312 Kan. at 246.

A defendant's right to present their theory of defense is not without limit, and "[t]he defendant's fundamental right to a fair trial is violated if relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense is excluded." *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014). This court reviews de novo N.W.'s claim that the district court's admissibility decision interfered with his rights—looking at the issue anew with no deference to the district court's decision. 300 Kan. at 927.

24

When reviewing a district court's decision to admit or exclude evidence, this court applies a multi-step analysis. First it determines whether the evidence is relevant; second it determines which rules of evidence or legal principles apply; and third it analyzes the district court's decision with a standard of review determined by the rule or principle being applied. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (Kan. 2010).

Beginning with step one, relevant evidence is that which is both probative and material. K.S.A. 60-401(b); see also *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Using an abuse of discretion standard, the evidence is probative if it tends to prove a material fact. "Material evidence tends to establish a fact that is at issue and is significant under the substantive law of the case." *State v. Robinson*, 306 Kan. 431, 436, 394 P.3d 868 (2017).

### 1. Allegations that the victims were previously abused by other people was not relevant.

At trial, N.W.'s attorney asked S.S.'s mother if S.S. had been inappropriately touched by someone other than N.W. The State objected, but S.S.'s mother had responded "[n]o. She had not." N.W.'s attorney explained to the court that there was an allegation S.S. had been molested by an uncle. The attorney alleged that N.W.'s mother would testify that S.S.'s mother told her about the uncle molesting S.S.

In response to the district court allowing questioning out of earshot of the jury, S.S.'s mother denied that S.S. had been molested by an uncle or anyone other than N.W. and denied telling anyone to the contrary. N.W.'s counsel also stated that he intended to ask L.C. about allegations she may have made against other children while they played hide-and-go-seek, though he provided no additional context for why he believed that to be true. After hearing the argument and evidence, the court told defense counsel to "move on" unless he had "something to substantiate that there was something."

25

Although unclear, it seems that N.W intended to use this evidence to impeach S.S.'s credibility, but N.W. provides no argument showing the evidence is probative or material. The trial testimony shows that the only "evidence" of S.S. being previously molested would have been testimony from N.W.'s mother that was uncorroborated and contradicted by S.S.'s mother. Moreover, S.S.'s mother explained that when she and S.S. spoke at the McDonald's, she asked S.S. if anyone other than N.W. had touched her and S.S. responded "no." Thus, even assuming the evidence would have attacked S.S.'s credibility and her credibility is material to the case, the evidence was not probative because it did not tend to prove a material fact. It was a mere unsupported allegation from the defendant's mother, which was contradicted by other testimony.

Regarding L.C., it is unclear what N.W.'s counsel was going to pursue. He said that "[w]hen we get around to [L.C.] I intended to question whether she made allegations of that (unintelligible) of the other kids that she played with in hide-and-seek. The evidence would be is that she made an allegation (unintelligible) as well." N.W.'s brief on appeal provides no additional insight into what N.W. intended to argue at trial. Further, N.W. provides no argument why this allegation would be material and why L.C.'s testimony would have had any probative value. This court cannot make these arguments for N.W., and this incidental point in his brief was not developed and is deemed waived or abandoned. *Meggerson*, 312 Kan. at 246.

### 2. *Allegations that L.C.'s mother failed to supervise L.C. and her brother*

N.W. sought to introduce evidence to establish why he, as "a 15 year old [was] running around with these little ones." To that end, N.W.'s father testified to an incident in 2015 when he saw L.C. and her twin brother run into the street wearing only diapers. The State objected based on relevance, and the court allowed N.W. to pursue lines of questions related to whether N.W.'s parents were concerned about L.C. and her brother. N.W.'s mother testified that she told N.W. to involve L.C. and S.S. in play when his

26

younger cousin was over. She also confirmed that she had concerns for L.C. and her brother's safety and asked N.W. to keep an eye on them so they would not get hit by a car.

N.W. provides no argument as to how the 2015 incident of L.C. running in the street was relevant to N.W.'s actions in 2019 and 2020. Moreover, the district court permitted N.W.'s mother to testify that N.W. played with the younger children at her direction, that she had previously been concerned about their safety, and that he played with the children when his younger cousin was there. All of that demonstrated N.W.'s argument for his intent and purpose in engaging younger children in playing. Further, other teenage kids testified that they also played with the younger kids, showing it was not an unusual activity in the neighborhood. Even assuming N.W.'s reason for playing with the younger kids was material to the charges and his defense, the court permitted the evidence.

### 3. Treatment at the Guidance Center

N.W. claims that the district court prevented his defense by prohibiting him from questioning L.C.'s mother about services her children received at the guidance center. Prior to trial, the district court entered a protective order precluding questions about L.C. and her siblings' services at the guidance center. On direct examination, L.C.'s mother explained that L.C. was familiar with the word "inappropriate" because she had been "in the youth psychosocial program through the guidance center" to help with her ADHD. On cross-examination, N.W.'s counsel did not ask L.C.'s mother about her services at the guidance center.

Two days later, N.W.'s counsel moved the court to reconsider its prior protective order preventing questioning about guidance center services. N.W.'s counsel argued that "we believe and we would like to show that this was a family in crisis" and that "the

27

family tributes [sic] problems that [L.C.] is having to what they claim was an act of abuse by my client." The attorney wanted to see "[w]hat other factors might be influencing what they are seeing" in terms of behavioral changes. The court ultimately found that the State did not open the door into inquiring about services L.C. and her siblings received, that such inquiry had no relevance, and that there was no testimony L.C. received counseling due to the alleged abuse.

On appeal, N.W. provides no argument why L.C.'s or her siblings' guidance center services would be probative to prove a material fact. There is no evidence that L.C. or her siblings received services at the guidance center related to allegations of abuse or other issues within the home. N.W. did not provide or elicit evidence regarding turmoil at L.C.'s home and did not allege there was any allegation of such beyond the attorneys' mere speculation. See *State v. Seacat*, 303 Kan. 622, 642-43, 366 P.3d 208 (2016) (affirming district court's exclusion of "exceptionally speculative" evidence that alleged murder victim was depressed and committed suicide because of her medication).

Although the State asked about any changes to L.C.'s behavior during the alleged abuse timeframe, it did not ask whether L.C. was receiving services due to the abuse or any other stress and made no argument to that effect. L.C.'s mother testified that she received services due to having ADHD. To the extent N.W. wanted to examine areas of possible stress or abuse within L.C.'s home, this could have been accomplished without questions about the guidance center services. The defense failed to attempt to prove this issue and provides no argument that such proof was excluded by the protective order. See *Robinson*, 306 Kan. at 436-37 (evidence that the parties engaged in consensual sex was not material because the State never attempted to prove the relations were not consensual).

IV.     CUMULATIVE ERRORS DID NOT DEPRIVE N.W. OF A FAIR TRIAL

Lastly, N.W. vaguely argues that he was deprived of a fair trial because of the cumulative effect of errors. Even assuming N.W. had made a cogent argument, the cumulative error rule is inapplicable here because there are no errors. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

CONCLUSION

After a jury trial, N.W. was convicted of multiple counts of aggravated indecent liberties with a child based largely on the disclosure and testimony of the two young victims. The victims' statements were markedly similar, incredibly detailed, consistent over time, and corroborated by testimony about the victims' behavior during the timeframe. As with many cases of sexual assault of young victims, their memories are not exact, but incidents of conflicting testimony do not negate the evidence supporting N.W.'s convictions. Finding no errors, this court affirms.

Affirmed.